**TRAVELERS INSURANCE COMPANY
et al., Appellants,**

v.

**CHICAGO BRIDGE & IRON COMPANY
et al., Appellees.**

No. 15418.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

June 5, 1969 On Third Motions for Rehearing.

Fourth Motions for Rehearing Denied

June 26, 1969.

Ben G. Sewell, Thomas S. Terrell, Houston, Sewell, Junell & Riggs, Houston, of counsel, for appellant Travelers Ins. Co.

Kemper, Kemper & Ewing, T. M. Kemper, Houston, for appellant American Motorists Ins. Co.

John L. McConn, Jr., Howard L. Nations, Houston, Butler, Binion, Rice, Cook & Knapp, Houston, of counsel, for appellee Chicago Bridge & Iron Co.

David Bland, Houston, Barrow, Bland & Rehmet, Houston, of counsel, for appellee J. T. Thorpe Co.

On Third Motions for Rehearing

COLEMAN, Justice.

The previous opinions of this Court are ordered withdrawn and this opinion is substituted.

This is a suit to determine the party or parties upon whom rests the duty to pay the workmen's compensation benefits received by Ulysses Harrison as a result of injuries received in the course of his employment by J. T. Thorpe Company on the 20th day of July, 1961, and the amount paid to him by the Chicago Bridge & Iron Company in settlement of his claim for damages for injuries suffered by him by reason of the negligence of an employee of that company.

At the time Harrison received his injuries he was engaged in the construction of a catalytic cracking unit at the American Oil Company Refinery in Texas City, Texas. M. W. Kellogg Company was the general contractor. Chicago and Thorpe were subcontractors under Kellogg. Travelers Insurance Company was Kellogg's insurer, having issued it both a general comprehensive liability policy and a comprehensive automobile liability policy which contained the standard automobile loading and unloading clauses. Thorpe was insured by American Motorists Insurance Company for both Workmen's Compensation coverage and Comprehensive General Liability coverage including a contractual liability endorsement.

Harrison first recovered medical and compensation payments from American Motorists, the compensation carrier for Thorpe, in the sum of $18,765.03. Then on July 10, 1963, he filed a third party action against Kellogg and Chicago Bridge. American Motorists and Travelers were brought into the suit. American Motorists intervened for the amount paid as Workmen's Compensation benefits. Eventually Chicago Bridge settled the case with Harrison for $62,500.00 and indemnified him against any compensation recoupment by American Motorists. Chicago Bridge then filed a cross-action and third party action against Thorpe, alleging an indemnification agreement, against American Motorists by reason of the contractual liability endorsement to the general liability policy issued by it to Thorpe, and against Travelers by reason of the loading and unloading clause in the automobile liability policy issued by it to Kellogg. Thorpe answered and sought recovery over against American Motorists and asserted that Travelers' policy indemnification of Chicago Bridge was primary over Thorpe's contractual indemnification of Chicago Bridge.

The case proceeded to trial before a jury in April, 1968, and at the conclusion of the testimony the trial court sustained Chicago Bridge's motions for instructed verdict and rendered judgment for Chicago Bridge against Thorpe, American Motorists, and Travelers. Thorpe's motion for instructed verdict over against American Motorists and Travelers was also sustained. Judgment was entered rendering American Motorists and Travelers jointly and severally liable to Chicago Bridge and Thorpe. Both American Motorists and Travelers appeal.

Employees of Chicago Bridge and Thorpe were working on the tower at the same time. Thorpe's subcontract included insulating the upper level of the catalytic cracking unit by means of a gunniting process which produced a dry cement waste material called "rebound." Periodically this material was removed from the unit by loading it in a 55 gallon barrel. The barrel was then lowered to the ground and either emptied on the ground, or into a dump truck furnished by Kellogg. From time to time the truck was driven by a

Kellogg driver from the work area and the rebound was disposed of as debris. There was an agreement between C. L. Thomas, Thorpe's superintendent, and Howard Stewart, Chicago Bridge's superintendent, that Thorpe could use certain equipment owned and erected on the job by Chicago Bridge on the condition that Thomas would execute on behalf of Thorpe a printed form equipment rental agreement furnished by Chicago Bridge. On June 29, 1961, such an agreement was executed so that Thorpe employees could use the Chicago Bridge scaffolding. Prior to the accident it was agreed between Thomas and Stewart that Thorpe employees could use Chicago Bridge equipment to remove the rebound. Included in the agreement was a boom and hoist to be operated by a Chicago Bridge employee. It was understood that the equipment rental agreement would be identical in terms, except for the description of the equipment, to the one previously executed. Prior to the accident the lease was prepared and signed by Stewart, but Thomas signed the lease about an hour after the accident.

There was evidence that, pursuant to the agreement between Thomas and Stewart, on the afternoon of July 20, 1961, George Cavitt, Chicago Bridge's hoist operator, was lowering the barrel partially filled with rebound from the top of the unit to the Kellogg truck at its base when, due to Cavitt's negligence, the drum came loose from the hook attached to the hoist line and fell, striking Harrison. As a result of the injuries he received, Harrison was rendered a paraplegic.

When Harrison filed his third party action against Kellogg and Chicago Bridge, Chicago Bridge tendered its defense to Thorpe in accordance with the indemnification clause in the equipment rental agreement. Thorpe then tendered the defense of Chicago Bridge to American Motorists pursuant to the contractual liability endorsement to their comprehensive liability policy. American Motorists accepted the defense of Chicago Bridge and employed a law firm, The Kempers, who filed an answer on behalf of Chicago Bridge on August 1, 1963. In February, 1964, Kellogg, who had answered on August 3, 1963, was dismissed from the suit by Harrison. On August 22, 1966, The Kempers withdrew from the defense of Chicago Bridge, and American Motorists denied liability under their policy of insurance with Thorpe and the contractual liability endorsement thereto, primarily on the ground that recently they had discovered that the equipment rental agreement had not been signed by Thomas until after the accident so that no written agreement contained the indemnity agreement when Harrison was injured.

Acting under protest Chicago Bridge then substituted John L. McConn, Jr. as its counsel of record and undertook its own defense. The Kempers, as attorneys for American Motorists, on January 6, 1967, filed a petition in intervention to recover the Workmen's Compensation previously paid to Harrison. Prior thereto on August 31, 1966, before American Motorists turned over the Harrison defense file to counsel for Chicago Bridge, the issue of possible coverage for George Cavitt and Chicago Bridge under the Travelers policy was brought to the attention of Chicago Bridge by The Kempers. Within a few days thereafter Chicago Bridge gave notice to Kellogg and Travelers that there was a possibility of coverage under the loading and unloading clause of the automobile policy issued to Kellogg by Travelers. After investigating the facts, on January 3, 1967, the attorney for Chicago Bridge notified Travelers that his investigation indicated that the dump truck in use at the scene of the accident was under the control of Kellogg and that, therefore, George Cavitt and Chicago Bridge were additional insureds under the loading and unloading clause. Travelers refused to accept the tender of Chicago Bridge's defense. Thereafter Chicago Bridge settled the case with Harrison and the further proceedings previously recited occurred.

*American Motorists Insurance Company*

By its first point American Motorists contends that the trial court erred in concluding as a matter of law that the "Equipment Rental Agreement" between Thorpe and Chicago Bridge was a "written contract" as contemplated by the Contractual Liability Coverage Endorsement to the policy of insurance issued to Thorpe by American Motorists, and in concluding as a matter of law that the accident in question occurred prior to the "execution" of the Equipment Rental Agreement.

The Contractual Liability Coverage Endorsement contains these provisions:

"1. Coverage Y—Contractual Bodily Injury Liability.

To pay on behalf of the insured all sums which the insured, by reason of the liability assumed by him under any written contract designated in the schedule below, shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident.
"* * *

"DESIGNATION OF CONTRACTS

Any written agreement to assume the legal liability of others, relating to the insured's business as described in Declaration 1 of the policy.

"It is agreed that the insurance afforded under this endorsement is subject to the following additional provisions:

"1. This endorsement does not apply:

"(j) to any accident occurring prior to the execution of any contract;
"* * * *."

The last quoted paragraph was typewritten on a printed form, except the part beginning with the words "It is agreed" were typed on a separate sheet of paper and attached to the printed form.

Our problem is to determine the meaning of this provision of the insurance policy, and then to determine whether the Equipment Rental Agreement is such a written contract as is required by the insurance policy. Words used in an insurance contract are to be given their plain, ordinary, and generally accepted meaning unless consideration of the instrument itself shows them to have been used in a different sense. Western Reserve Life Ins. Co. v. Meadows, 152 Tex. 559, 261 S.W.2d 554 (1953). The rule of liberal construction in favor of the insured applies only when the contract is ambiguous and susceptible of more than one interpretation. Transport Ins. Co. v. Standard Oil Company of Texas, 161 Tex. 93, 337 S.W.2d 284 (1960). The contract must be enforced as made if the language used is plain and unambiguous. Home Ins. Co., New York v. Rose, 152 Tex. 222, 255 S.W.2d 861 (1953).

None of the parties contend that the contractual liability endorsement covers an oral contract. Chicago Bridge and Thorpe contend that a written contract between Chicago Bridge and Thorpe was created when the agreement between them was reduced to writing and signed by the superintendent for Chicago Bridge, even though no one had signed for Thorpe. They reason that all provisions of the contract were agreed upon between the parties, one of which had signed and the other was using the leased equipment. Appellant contends that the policy requires a contract in writing signed by the parties, and that no contract in writing had become effective at the time Harrison was injured.

The Endorsement refers to the assumption of liability under a "written contract", and also a "written agreement" to assume the legal liability of others. The typewritten addition to the printed form speaks of an accident occurring "prior to the execution of any contract."

Appellees challenge the validity of the typewritten addition to the printed form on the ground that it does not form a part of the insurance policy because it is a limita-

tion of coverage not part of a standard policy approved by the State Board of Insurance, and not filed with or approved by that body as a special form. Appellant replies that the law of Texas does not require the approval of liability insurance policies except to enable the Board to set an appropriate rate. The Insurance Code does not require uniform policies. In addition appellant introduced a certificate of the Commissioner of Insurance to the effect that the records of the State Board of Insurance reflect that no approval of the Contractual Liability Coverage Endorsement to the policy in question "is found to exist in the records. * * *" Appellants question whether the printed form can be considered after eliminating the typewritten addition even though the printed form is in the language of a standard form approved by the State Board.

Appellee introduced a certificate of the Commissioner of Insurance which recites that the "printed portion of the Contractual Liability Coverage Endorsement was the only standard form of Contractual Liability Coverage Endorsement which had the approval of the State Board of Insurance, State of Texas, on January 1, 1961," and that no approval had been granted to American Motorists Insurance Company by the State Board of Insurance or to any licensed rating organization of which it is a member or subscriber to issue to American Motorists Insurance Company a Contractual Liability Endorsement containing the typewritten language previously quoted.

■ It will be noted that neither of the certificates state that American Motorists Insurance Company or any licensed rating organization of which it is a member or subscriber has filed with the State Board of Insurance a Contractual Liability Coverage Endorsement in any form. Appellee's certificate merely states that the printed portion of the endorsement used by American Motorists in the policy conforms to a standard form which had the approval of the Board. The Insurance Code does not authorize the Board to establish uniform

policies for casualty insurers. There is no specific authorization of standard forms. Casualty companies may write policies to meet specific risks. In Key Western Life Insurance Co. v. State Board of Insurance, 163 Tex. 11, 350 S.W.2d 839 (1961), the Supreme Court said: " * * * The Board of Insurance Commissioners is empowered to disapprove a form for certain specific reasons only and may not dictate to the insurance companies the particular form to be used. * * *" This statement was made with reference to life insurance companies and is not applicable to companies writing certain other types of insurance. It is applicable to the type of insurance with which we are concerned. It appears that the Board has adopted and approved certain form manuals for the guidance of insurance companies and the use of employees in processing filings. However the fact that a policy form has been approved does not obviate the necessity of the filing with the Board by the insurance companies of the particular policy forms which they propose to use. McCarthy v. Wood, 245 F.2d 853 (5th Cir., 1957); State Board of Insurance v. Sam Houston Life Ins. Co., 344 S.W.2d 709 (Tex.Civ.App., Austin 1961).

Art. 5.15, Insurance Code, V. 14, V.A.C. S., requires insurance companies to file with the Board "every manual of classifications, rules and rates, every rating plan and every modification of any of the foregoing which it proposes to use. Every such filing shall indicate the character and extent of the coverage contemplated and shall be accompanied by the policies and indorsement forms proposed to be used, and the information upon which the insurer supports the filing."

Art. 5.20, Insurance Code, V. 14, V.A.C. S., provides that "no insurer or employee thereof * * * shall knowingly issue any policy of insurance nor charge, demand or receive a premium thereon except in accordance with the applicable filing which has been approved by the Board * * *"

Since the requirements of Art. 5.15, supra, were not complied with by the insurer, the issuance of the endorsement was unauthorized and illegal. We do not believe, however, that Commercial Union Assurance Co., Ltd. v. Preston, 115 Tex. 351, 282 S.W. 563, 45 A.L.R. 1016 (1926), is applicable to this situation. There the Supreme Court held that certain unauthorized language narrowing the coverage typed into a fire insurance policy was void because the standard fire policy "prescribed" by the Texas Insurance Commission contained no such clause (See Art. 3.42, Insurance Code). The Court said that unless the unauthorized language was held void "true effect cannot be given to the prohibition that no other forms be used than those established or approved by the commission." In that case an endorsement was added to the standard form of fire insurance policy. In view of the language of the statute we assume that in this case there is no standard form prescribed by the Board.

Insurance against loss from liabiltiy assumed by the assured under any contract executed at the time of issuance or to be executed in the future might require a different premium from an agreement to assume liability under contracts already executed. Insurance against loss from liability assumed under a contract covering prior as well as future accidents might require a different premium from one covering future accidents only. Such matters affecting rates appear to be the reason for requiring policy forms and endorsements to be furnished the Board. The typewritten matter appears to be an integral part of the endorsement under review. It begins, "It is agreed that the insurance afforded under this endorsement is subject to the following additional provisions: (1) This endorsement does not apply: (j) to any accident occurring prior to the execution of any contract; * * *." The entire instrument constitutes an endorsement form, for which a rate had not been approved.

It should not follow that no insurance is provided to the insured by reason of the insurer's violation of the law. This would defeat one purpose of requiring proposed policies and endorsements to be included in a filing with the Board—the protection of the public. It would be unrealistic to expect the public to check with the Board before purchasing insurance. The statute does not in unmistakable language prohibit the issuance of such contract of insurance. It prohibits knowingly issuing a policy of insurance except in accordance with the applicable filing approved by the Board. The primary purpose of the legislature was not to require approval of policy forms, but approval of the premium charges. By this language the legislature has prohibited the issuance of a policy of insurance, including an endorsement for which there is a premium charge, prior to the time the premium to be charged by the insurer has been approved by the Board. This statement is supported by other provisions of Art. 5.15 of the Insurance Code and by the penalty clause of Art. 5.20 providing: "Any violation of the terms of this article shall constitute unjust discrimination and shall constitute rebating, and shall be sufficient grounds for the revocation of the permit of the insurer or of the license of the agent being guilty of such unjust discrimination and rebating; * * *" The insurer cannot take advantage of its own default as against the innocent insured. A penalty for the violation is prescribed in the Act. The language of Hennessy v. Automobile Owners' Ins. Ass'n, 282 S.W. 791, 46 A.L.R. 521 (Tex.Com.App.1926), is appropriate: "When the language used in this statute, the evil for which remedy was sought, and the effect of holding contracts void when entered into without complying with the requirements made, are all taken into consideration, we think it is manifest that the Legislature had no intention to declare void sales made where the acts required are not performed."

In any event, the insured is protected only by the endorsement as issued to and ac-

cepted by him. Appellant did not plead that the endorsement is void. There is no evidence that the insurer has submitted to the Board in connection with a "filing" any endorsement of this nature whereby the typewritten provisions alone could be voided as being unauthorized. The endorsement by its terms does not apply to an accident occurring prior to the execution of "any contract". From a construction of the entire endorsement the word "agreement", as used in the schedule "designation of Contracts", must be construed to have been used in the same sense as the word "contract".

■ The term "execute" means "to finish" or "make complete". The execution of a contract includes the performance of all acts necessary to render it complete as an instrument. The term imports the idea that nothing remains to be done to make a complete and effective contract. Guadalupe-Blanco River Authority v. City of San Antonio, 145 Tex. 611, 200 S.W.2d 989, 1002 (1947); Smith v. School District No. 1, Marshall County, 187 Okl. 184, 102 P. 131, 134, 135 (1940); Kennedy & Parsons Co. v. Lander Dairy & Produce Co., 36 Wyo. 58, 252 P. 1036, 1038, 51 A.L.R. 315 (1927); Lynch v. Figge, 200 App.Div. 92, 192 N.Y.S. 873, 876; Perko v. Rock Springs Commerical Co., 37 Wyo. 98, 259 P. 520, 522 (1927); Hofgesang v. Silver, 223 Ky. 101, 3 S.W.2d 185, 186 (1928); Glick v. Daniel, 184 Ark. 576, 42 S.W.2d 1007, 1008 (1931); Reeves Furniture Co. v. Simms, 59 S.W.2d 262 (Texarkana Tex.Civ.App.1933).

In Simmons and Simmons Construction Co. v. Rea, 155 Tex. 353, 286 S.W.2d 415 (1955), the Supreme Court quotes from Corbin on Contracts with apparent approval as follows:

"The following observations by Professor Corbin in his work on contracts are pertinent:

" 'If a written draft of an agreement is prepared, submitted to both parties, and each of them expresses his unconditional assent thereto, there is a written con-

tract. So far as the common law is concerned, the making of a valid contract requires no writing whatever; and even if there is a writing, there need be no signatures unless the parties have made them necessary at the time they express their assent and as a condition modifying that assent. * * * An unsigned agreement all the terms of which are embodied in *a writing, unconditionally assented to* by both parties, is a written contract. * * * All that is necessary to the creation of an informal contract, whether reduced to writing or not is an expression of assent in any form. The writing itself is not necessary; if put in writing, a signature is not necessary; and even if in writing and signed, a delivery is not necessary. It is an expression of assent that is required. * * * For the validity of an informal contract, a writing is necessary only when at least one of the parties has sufficiently expressed his intention not to be bound without one. *In such a case, the agreement must be put in writing; and that writing must be presented to him and receive his assent.* No doubt, he normally means that the writing shall be signed by both parties; *and he may mean also that it shall be delivered in some fashion.* Whatever requirements of this sort that he may have made in advance, he can always bind himself by a clear expression of intent to do so without them; but neither party can of his own motion dispense with such requirements laid down by the other party, any more than he can eliminate any of the provisions of the other party's proposal. *If the reduction of the agreement to writing is thus made necessary, an assent to the writing as a sufficient one must also be manifested*; this manifestation commonly consist of signing and delivery.' Corbin on Contracts, Vol. 1, §§ 31 and 32, pp. 85 and 92." (Emphasis added.)

Mr. Stewart, the Chicago Bridge superintendent, testified that Mr. Thomas, Thorpe's superintendent, came to see him about using the "Chicago boom" as soon

as Stewart could release it. In answer to the question, "Under what circumstances?", Stewart stated: "Signing a * * * one of those agreements like that (indicating)." He said that Thomas understood that it would be the same type of agreement as one previously entered into when Thorpe used the Chicago Bridge Scaffolding.

This rental agreement was identified by Stewart and introduced into evidence:

"Lessor: Chicago Bridge & Iron Company

"Lessee: J. T. Thorpe Company

"Equipment covered by this agreement:

" 'Chicago Boom' Mounted on side of Reactor

"Operator will be furnished by___x___Lessor

_____Lessee

"Rental Rate: $ As agreed per _____

"In consideration of the rental to it by the lessor of the equipment referred to above, the lessee hereby agrees to accept full responsibility for the said equipment during the rental period and agrees to return said equipment to lessor in as good condition as when received, ordinary wear and tear excepted; and in addition agrees to indemnify the lessor against and hold it harmless from any and all claims, demands, causes of action or lawsuits for personal injuries (including deaths) or for property damage arising out of the use or operation of said equipment during the rental period.

_____J. T. Thorpe Co.____ (LESSEE)

BY: C. L. Thomas, Jr._ (s)

Date: 7/20/61___

Accepted:
CHICAGO BRIDGE & IRON COMPANY
By:___H. G. Stewart_____(s)___ "

———◆———

Stewart testified that he kept the printed forms in his office and that the typewritten portion was completed and he signed the instrument on either July 19 or the morning of July 20. He told Mr. Thomas that the instrument was ready and "he could go by and sign it," before Harrison was hurt. Thomas had not signed before Harrison was hurt. Stewart answered, "Yes, sir," to the following question asked by Mr. Mc-Conn, attorney for Chicago Bridge: "Was that the only thing that remained to be done, merely his affixing the signature to it?"

After the accident Mr. Stewart saw Mr. Thomas and asked him if he had signed the lease agreement and Thomas said "that he had not but he—he was going by and sign and get his copy."

On examination by Mr. Bland, the attorney for Thorpe, Stewart testified that he talked with Thomas "some few days" before the accident happened and that he

allowed Mr. Thomas to go ahead and use the equipment in accordance with the agreement that he had with him, that he (Thomas) "would be bound by the same terms of the printed form" used previously with regard to scaffolding.

Mr. Thomas testified that in addition to the Chicago boom the J. T. Thorpe Company "leased" some of the Chicago Bridge & Iron Company's scaffolding. He stated: "* * * Any of his equipment that we worked from or used we signed one of these agreements for it—I did." He testified that he had talked to Mr. Stewart about the boom and that "We—I had agreed to sign one of these leases."

Mr. Thomas testified that except for the description of the equipment to be used, he knew exactly what the wording of the lease agreement would be before it was written up, but that he had not talked to Mr. Stewart about whether the boom lease was ready for signing before the accident. He said that he had agreed to sign one of the forms any time he was using Chicago Bridge equipment, and that he began using the boom before the agreement was signed possibly three or four days. He signed the agreement after the accident, and that as between Stewart and himself it was just as if it had been signed before the accident because it was agreed upon.

He gave the quoted answers to these questions:

"QUESTION: It was a routine sort of thing, wasn't it?

"ANSWER: Right. that's right. If it had have been something real important—which it has turned out to be—I would have went with him at that time when we talked about it and signed it, but we had been using this equipment and signing this thing as it came up, or as I got over there to sign them."

■ Undoubtedly it was the intention of both parties that the instrument would be signed by both parties. The question raised by appellants, however, is whether they intended the instrument to be binding before it was signed. There is evidence to support such an intention. The evidence does not require a finding that the requirement of signatures was a "condition modifying the assent to the agreement." Prior to the accident the agreement, contractual in nature, was in writing. In Rea, supra, the Supreme Court said: "* * * intention is usually an inference to be drawn by the fact finder from other facts and circumstances in evidence." Appellant does not complain that the trial court erred in withdrawing the case from the jury and entering a judgment based on facts concerning which there is a dispute in the evidence. The complaint is that the trial court erred in refusing to enter a judgment for American Motorists.

The testimony both of Stewart and of Thomas was to the effect that Stewart required Thomas to agree to sign a written lease as a condition to his agreement that Thorpe could use Chicago Bridge equipment. While the evidence will support a finding that the written contract was intended only as a convenient memorial of the oral agreement, or that they intended that no contract be formed until the instrument was signed by both parties, neither of these findings is required by the evidence. There is also evidence from which an inference could be drawn that the parties intended the contract to be in writing and to be effective from the time the equipment was first used by Thorpe. We conclude that the trial court so found.

Appellees contend that the evidence has established as a matter of law the proposition that American Motorists cannot assert its defense that the contractual liability endorsement does not give coverage to Thorpe because the lease agreement not executed prior to the accident since the evidence establishes as a matter of law (1) that the defense has been waived, and (2) that American Motorists is estopped to assert the policy defense. Appellees do

not question the well settled rule that neither waiver nor estoppel may operate to change, re-write or enlarge the risks covered by an insurance policy. Washington Nat. Ins. Co. v. Craddock, 130 Tex. 251, 109 S.W.2d 165, 113 A.L.R. 854 (1937); Boyd v. Travelers Ins. Co., 421 S.W.2d 929 (Tex.Civ.App., 14th Dist., 1967, err. ref., n. r. e.).

Appellees do not contend that the policy of insurance issued by American Motorists covers contractual liability aside from the endorsement. By the endorsement American Motorists agrees to pay on behalf of Thorpe all sums which Thorpe shall become legally obligated to pay by reason of the liability assumed by Thorpe under *any written* contract. Thorpe must prove a written contract to assume the liability of Chicago Bridge before there is coverage under the policy of insurance. We conclude that Thorpe has done so.

██ The policy coverage cannot be enlarged by waiver or estoppel to include oral contracts. Great American Reserve Insurance Co. v. Mitchell, 335 S.W.2d 707 (San Antonio Tex.Civ.App., 1960, writ ref.); Southland Life Ins. Co. v. Vela, 147 Tex. 478, 217 S.W.2d 660, 663 (1949); Employers Casualty Company v. West, 410 S.W.2d 291 (Amarillo Tex.Civ.App., 1967, err. ref., n. r. e.); Powell v. American Casualty & Life Co., 250 S.W.2d 744, 747 (Dallas Tex.Civ.App., 1952, err. ref., n. r. e.); Massachusetts Bonding & Insurance Co. v. Dallas Steam Laundry & Dye Works, 85 S.W. 2d 937 (Eastland Tex.Civ.App., 1935, writ ref.).

In their briefs both Thorpe and Chicago Bridge state that they agree with the general proposition of law stated. Thorpe does contend that the condition of forfeiture of coverage, "execution prior to any accident", was waived and that American Motorists is estopped to assert it as a matter of law. Chicago Bridge contends that it is seeking coverage by reason of a *written agreement* and does not seek to enlarge the coverage by waiver and estoppel beyond the risk contractually assumed by American Motorists.

██ The language used in the column headed "Designation of Contracts ('Any written agreement to assume the legal liability of other, relating to the insured's business as described in Declaration 1 of the policy')" literally construed would include contracts executed after liability had accrued. This was recognized by the insurer in that it was thought necessary to restrict the coverage by adding a covenant that the endorsement would not apply to an "accident occurring prior to the execution of any contract." The language is that of an agreement between the parties restricting the coverage of the policy. It is an exclusion from the coverage previously granted by the terms of "Coverage Y", and, in effect adds the words "and occurring after the execution of such contract." It also modifies the language used in paragraph IV of the insuring agreements which implies that coverage is granted to all accidents that occur after the effective date of the endorsement. In view of the rule requiring strict construction of the policy against the insurer, the language would not be considered to modify the words "written agreement" used in the column "Designation of Contracts." Trahan v. Southland Life Insurance Co., 155 Tex. 548, 289 S.W.2d 753 (1956).

American Motorists undertook the investigation of this case on July 21, 1961, one day after the accident. Their representatives were given copies of the Equipment Rental Agreement by Thorpe soon after the accident. The Agreement was dated as of the day of the accident. After Harrison filed suit against Chicago Bridge, American Motorists assumed Thorpe's liability to defend Chicago Bridge pursuant to Chicago Bridge's letter demand on Thorpe and Thorpe's letter demand on American Motorists. In the letter demand Chicago Bridge claimed that the indemnity agreement was in writing. At that time American Motorists decided that Thorpe had the duty to defend Chicago Bridge and .

that under its policy of insurance, it had the duty to discharge Thorpe's obligation to Chicago Bridge.

■ American Motorists retained lawyers who filed an answer for Chicago Bridge on August 1, 1963, and remained in complete control of the defense on their behalf until it withdrew from the case on August 22, 1966, for the sole reason that there was no insurance coverage creating a duty to defend or pay. When Thorpe was named in the suit as a third party defendant, American Motorists had assumed the position of plaintiff in the case seeking reimbursement for the amount it had paid to Harrison as workmen's compensation benefits. By its denial of liability it had assumed a position adverse to Thorpe. Under these conditions there was no duty on the part of Thorpe to again tender the case to American Motorists. Womack v. Allstate Ins. Co., 156 Tex. 467, 296 S.W.2d 233 (1956); Steel Erection Co. v. Travelers Indemnity Co., 392 S.W.2d 713 (Tex.Civ. App., San Antonio, 1965, ref., n. r. e.); Great American Indemnity Co. v. City of Corpus Christi, 192 S.W.2d 917 (Tex.Civ. App., San Antonio, 1946).

On August 1, 1966, Thorpe's attorney wrote a letter to its Branch Claim Manager in which he advised him that he had agreed to present Stewart and Thomas to Harrison's attorney for depositions on the 4th of August. In this letter he also stated: " * * * We too are interested in any facts in re the subject accident that they can provide under oath, but particularly are we vitally interested in the rental agreement as executed by them and the probable time thereof." On August 5, 1966, the Branch Manager in a report to the home office, among other things, stated: "During the course of my conversation with Cavitt he made some comments with respect to the equipment rental agreement that has raised a doubt in my mind that this item was in existence at the time of the accident. * * Should the deposition testimony confirm or otherwise suggest that the instrument was not drafted until after the accident, our

coverage is questionable." Thomas told appellant's attorney the facts concerning the signing of the agreement just prior to the taking of the deposition and Stewart also related the facts during a recess while taking the depositions according to their testimony. One of appellant's attorneys testified that he learned the facts "during the time of the depositions." The attorneys employed by American Motorists to represent Chicago Bridge thereafter participated in taking the depositions, during the course of which it was developed that Thomas had signed the agreement after the accident, a matter of doubtful materiality to Harrison's cause of action. American Motorists further delayed bringing the question of coverage to the attention of Thorpe until the depositions were written up. Soon thereafter American Motorists denied liability under the policy and their attorneys filed a motion to withdraw as attorneys for Chicago Bridge.

Before the depositions were completed American Motorists knew of the policy defense, yet they continued with the depositions. The testimony concerning the time of the signing of the Agreement was developed after this information was known and after American Motorists knew that their interests conflicted with the interests of Chicago Bridge and Thorpe.

Confronted with a similar fact situation, the court, in Allstate Ins. Co. v. Keller, 17 Ill.App.2d 44, 149 N.E.2d 482, 70 A.L.R.2d 1190, (1958), said:

"We must now consider whether plaintiff waived the breach by defendant of the co-operation clause. The law is generally well settled that the failure of an insurer promptly to elect to disclaim liability, upon discovering facts indicating a breach of the co-operation clause by the insured, constitutes a waiver by the insurer of any rights which might otherwise accrue to it as a result of the breach. Norwich Union Indemnity Co. v. Haas, 7 Cir., 1950, 179 F.2d 827; Searls v. Standard Accident Ins. Co., 1944, 316 Mass.

606, 56 N.E.2d 127; Daly v. Employers' Liability Assurance Corp., 1929, 269 Mass. 1, 168 N.E. 111, 72 A.L.R. 1436.

"* * * * * * * * * *

"Where an insurer's attorney has reason to believe that the discharge of his duties to his client, the insured, will conflict with his duties to his employer, the insurer, it becomes incumbent upon him to terminate his relationship with the client. Reynolds v. Maramorosch, 1955, 208 Misc. 626, 144 N.Y.S.2d 900; Helm v. Inter-Insurance Exchange, 1946, 354 Mo. 935, 192 S.W.2d 417, 167 A.L.R. 238; Hammett v. McIntyre, 1952, 114 Cal.App.2d 148, 249 P.2d 885. It was the duty of plaintiff's attorneys upon learning of the possible conflict of interests between plaintiff and defendant, to immediately notify defendant of this fact. Their failure to take such action can be attributed only to their desire to strengthen plaintiff's position in preparation for the filing of the instant suit. It would be untenable under such circumstances to allow plaintiff to disclaim liability under the policy."

The author of the Annotation titled "Liability Insurer—Refusal to Defend", 49 A.L.R.2d 694 et seq., at 718, states:

"Thus, it appears to be well settled that if an insurer unjustifiably fails to defend an action against the insured on the ground that the claim upon which the action against the insured was based is outside the coverage of the policy, and the insured thereupon undertakes the defense of the action, the insurer is liable for the amount of the judgment obtained in such action against the insured or of the settlement made by the latter."

 It is well settled in Texas that an insurer who unjustifiably refuses to defend an action against the insured, is liable to the insured for all reasonable and necessary expenses which the insured has incurred in conducting the defense. Heyden Newport Chemical Corp. v. Southern General Ins. Co., 387 S.W.2d 22 (Tex. 1965); Sewer Constructors, Inc. v. Employers Casualty Co., 388 S.W.2d 20 (Tex.Civ.App., 1st Dist. 1965, ref., n. r. e.).

 The allegations of Chicago Bridge's cross-action against Thorpe clearly brought the case within Thorpe's policy. The policy bound American Motorists to defend the suit even though groundless, false, or fraudulent. Their failure to defend Thorpe constituted a breach of the contract. There is a division of authority as to whether, in such a case, the insurer is liable for the amount of the judgment obtained against their insured where the claim against him was in fact not covered by the policy, particularly where the facts determinative of that question were not at issue in the case in which the judgment was rendered. In most jurisdictions recognizing that the refusal to defend is a breach of contract the amount of the judgment recovered against the insured can be recovered as damages. Of course, the amount of the judgment can be recovered where the refusal to defend is unjustified and the loss is covered under the policy. Southern Farm Bureau Casualty Ins. Co. v. Logan, 238 Miss. 580, 119 So.2d 268 (1960); Sims v. Illinois Nat. Casualty Co., 43 Ill. App.2d 184, 193 N.E.2d 123 (1963); but see Geddes & Smith, Inc. v. St. Paul-Mercury Indemnity Co., 51 Cal.2d 558, 334 P. 2d 881 (1959).

Appellant's Point One states that the trial court erred as a matter of law in refusing to hold that the Equipment Rental Agreement was not covered by the insurance policy. This is a contention that the trial court erred in refusing to render judgment for appellant as a matter of law. The point is overruled.

Points Two and Three are directed to the theories of recovery advanced by Chicago Bridge and Thorpe on the basis of waiver and estoppel, and have been considered in the opinion. Since the judgment of the trial court can be supported on the basis that the policy covered the Agreement in question, these points, as

well as Points Four, Five and Six, concerned with negligence, would not require a reversal if sustained.

Point Seven is overruled. The settlement made with Harrison by Chicago Bridge included an agreement to indemnify him against the subrogation rights of American Motorists. By virtue of the terms of the Equipment Rental Agreement this became Thorpe's obligation and American Motorists assumed the same obligation by its insurance contract with Thorpe.

Point Eight is also overruled. After American Motorists denied liability under the policy of insurance Thorpe employed attorneys to represent its interests. Some three years prior to that date Chicago Bridge had tendered the case to Thorpe by reason of the indemnity agreement. During that period of time American Motorists had furnished counsel both to Thorpe and Chicago Bridge. When American Motorists denied coverage, it also withdrew from the defense of the action by Harrison against Chicago Bridge and turned over its files to the lawyers representing Chicago Bridge and Thorpe. The actions of American Motorists constituted an anticipatory breach of the contract to defend Thorpe. In addition Thorpe's action in employing lawyers to represent it prior to the filing of an action against it by Chicago Bridge was the action of a reasonably prudent person under the circumstances. Even though part of the expense was incurred prior to the filing of action, it was a reasonably necessary expense incurred in defense of the action.

Points Nine and Ten complain of the trial court's claimed failure to require Chicago Bridge and J. T. Thorpe to make a "reasonable and good-faith response" to certain interrogatories propounded to them by American Motorists. After considering the interrogatories and the answers we cannot say that the trial court abused its discretion. The matters were fully developed in the evidence at the trial. Considering the record as a whole the matters complained of were not such as would be calculated to produce, and in all probability did not produce, an improper verdict.

The remaining Points do not present error.

### The Travelers Insurance Company

Appellant Travelers contends that the trail court erred in entering judgment against it because both Chicago Bridge and Thorpe were excluded from coverage, or not entitled to coverage, by virtue of the employee exclusion. Travelers reasons that Thorpe was an "insured", as that term is used in the automobile policy issued to Kellogg by Travelers, because Thorpe was "using" a hired vehicle at the time of the accident. Since Harrison was an employee of Thorpe, then Chicago and Thorpe are seeking to obtain coverage for bodily injuries to an employee of an "insured" and such a claim falls directly within the employee exclusion.

Without quoting the applicable provisions of the policy issued by Travelers it is clear that by its terms Travelers agreed to pay on behalf of any person loading or unloading the dump truck with the consent of Kellogg all sums which such person might become legally obligated to pay as damages because of bodily injury caused by accident and arising out of the loading or unloading of the dump truck which Kellogg had leased and was furnishing to Thorpe for the purpose of removing waste materials. Travelers Insurance Co. v. Employers Casualty Co., 380 S.W.2d 610 (Tex., 1964).

George Cavitt, a Chicago Bridge employee, was engaged in lowering a barrel of waste from the tower to the truck by use of the Chicago boom when the barrel came loose and injured Harrison, a Thorpe employee. Chicago Bridge was engaged in loading the truck for Thorpe and at the request of Thorpe.

It seems clear that Cavitt and Chicago Bridge were additional insureds under the Travelers policy because Cavitt was engaged in loading the truck with the permission of Kellogg and Chicago Bridge was an "or-

ganization legally responsible for the use" of the truck. Travelers contends that Thorpe is also an "insured" under the terms of the policy because it was the waste material from Thorpe's construction activities which was being loaded on the truck at the time of the accident. Travelers reasons that such an activity constitutes "use" of the truck by Thorpe with the permission of Kellogg. It is then argued that since the injured man was an employee of one insured, there is no coverage under the policy for a different insured by reason of the employee exclusion clauses of the policy reading:

"This policy does not apply:

"(a) * * *

"(b) Under Coverage A, to bodily injury to * * * any employee of the insured arising out of and in the course of (1) domestic employment by the insured, * * * or (2) other employment by the insured;

"(c) Under Coverage A, to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation * * * law, or any similar law."

If Thorpe is an "insured" under the terms of the policy as contended by Travelers, then neither Thorpe nor Chicago Bridge is covered by the policy because of the quoted employee exclusion clauses. Transport Insurance Co. v. Standard Oil Co. of Texas, 161 Tex. 93, 337 S.W.2d 284 (1960); Simpson v. American Automobile Insurance Company, 327 S.W.2d 519 (Mo.App., 1959); American Fidelity & Casualty Company, Inc. v. St. Paul-Mercury Indemnity Company, 248 F.2d 509 (5th Cir., 1967); United States Fidelity & Guaranty Co. v. American Fidelity & Casualty Co., 299 F.2d 215 (7th Cir., 1962); Hanover Insurance Co., Massachusetts Bonding Department v. Travelers Indemnity Co., 318 F.2d 306 (8th Cir., 1963).

Chicago Bridge contends that Thorpe is not an "insured" under the Travelers policy because (1) Thorpe does not fall within the definition of "insured" under Sec. III of the "Insuring Agreements" and (2) Thorpe is excluded from coverage under Sec. III (c) of the "Insuring Agreements" of the Travelers policy.

■ The Travelers policy defines "insured" as follows: "The unqualified word 'Insured' includes the named insured and also includes any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile was by the named insured or with his permission * * *."

It is the contention of Chicago Bridge that Thorpe is not an "insured" because it was not an "organization legally responsible for the use" of the Kellogg dump truck on the occasion in question since the injured party, Harrison, was its employee and as such was covered by workmen's compensation and had no common law cause of action against his employer.

The evidence shows that Thorpe employees place waste material in the barrel which is then lowered into the truck by use of the Chicago boom where other Thorpe employees empty the barrel. Thorpe was required by its contract with Kellogg to place the waste materials in the truck furnished by Kellogg. The Chicago boom was leased to Thorpe by Chicago Bridge under an agreement by which Chicago Bridge furnished the operator.

The word "use" is defined in the Travelers policy so as to include the loading and unloading of the truck. In view of the evidence recited there can be no doubt but that Thorpe was "using" the truck within the contemplation of the Travelers policy, and, therefore, comes within the definition of "insured" found in the policy. Travelers Insurance Co. v. Employers Casualty Co.,

380 S.W.2d 610 (Tex., 1964). The last clause of the definition of "insured" clearly means that the "named insured" can "use" the automobile. The "named insured" is a corporation, and if it can "use" the truck, there seems to be no reason why another corporation should be confined to a class that can only be "an organization legally responsible for the use" of the truck.

Section III (c) of the "Insuring Agreements" of the Travelers policy reads:

> "The insurance with respect to any person or organization other than the named insured does not apply:
>
> "* * *
>
> "(c) to any employee, with respect to injury to or illness, disease, or death of another employee of the same employer injured in the course of such employment in an accident arising out of the maintenance or use of an automobile in the business of such employer, * * *."

Chicago Bridge contends that Thorpe can only be an "organization legally responsible for the use of the truck" through the acts of its employees engaged in the "use" of the vehicle. It reasons that since Thorpe's employees are excluded from coverage by reason of Sec. III (c), Thorpe is likewise excluded.

Thorpe was "using" the truck because its employees were engaged in loading it. The Thorpe Company was not one included within the express terms of this exclusionary clause. There is no obvious reason why Thorpe should be excluded merely because its employees were not covered.

 Harrison was an employee of an additional insured under the terms of the Travelers policy; therefore Chicago Bridge, also an insured, was not within the coverage of the Travelers policy because of the employee exclusion provision of that policy.

 No written notice of the accident was given by Chicago or Thorpe to Travelers until August, 1966. However, Travelers did receive a written notice from Kellogg on September 5, 1961, forty seven days after the accident. Travelers admits that it waived late notice as to Kellogg by undertaking Kellogg's defense, but Travelers contends that there is no waiver as to the omnibus insured. The notice given to Travelers by Kellogg stated that no Kellogg equipment or employees were involved. The Travelers' Policy provides that when an accident occurs written notice shall be given by or on behalf of the insured to the company as soon as practicable. It provides that "such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the accident, the names and addresses of the injured and of available witnesses." Where an insurance company receives a proper and timely notice from the named insured, including "particulars sufficient to identify" the additional insured, it is not necessary that another notice be given by the omnibus, or additional, insureds. Capece v. Allstate v. State Farm, 86 N.J.Super. 462, 207 A.2d 207 (1965); Western Freight Ass'n v. Aetna Casualty & Surety Co., 255 F.Supp. 858 (W.D.Penn.1966, aff'd 3 Cir., 371 F.2d 541).

In this case, however, the named insured waited 47 days to give notice. It cannot be said, as a matter of law, that the notice was timely. Klein v. Century Lloyds, 154 Tex. 160, 275 S.W.2d 95 (1955); State Farm Mut. Auto. Ins. Co. v. Hinojosa, 346 S.W. 2d 914 (Waco Tex.Civ.App., 1961, n. r. e.).

While Travelers waived late notice as to Kellogg by undertaking its defense, there was no waiver as to an omnibus insured. American Fidelity & Casualty Co. v. Traders & General Ins. Co., 160 Tex. 554, 334 S.W.2d 772 (1960).

 The notice was not sufficient to identify those who might occupy the position of omnibus insureds since it specifically stated that no Kellogg equipment was involved. It was necessary, therefore, that

**904**

Chicago Bridge and Thorpe give notice "as soon as practicable".

George Cavitt, a Chicago employee, saw the accident as did Thorpe employees. Howard Stewart investigated immediately afterward and learned from Cavitt that the barrel was being lowered to a truck. He made a report to the home office, which reached Chicago's general counsel in the latter part of July, 1961. Cavitt's statement may not have been attached. Chicago's counsel was knowledgeable concerning insurance matters. However, the basis for the claim that Chicago Bridge and Thorpe were covered as additional insureds rests on the fact that a *Kellogg* truck was being loaded at the time of the accident. While Cavitt and Stewart did know that the truck was a Kellogg truck, and as late as March 4, 1968, Travelers had not established that a Kellogg truck was involved, that fact could have been established by a thorough investigation. A question of fact exists as to whether Chicago Bridge and Thorpe were diligent in learning of the coverage afforded them by the Travelers policy and thereafter giving proper notice to Travelers. Standard Accident Insurance Co. v. Employers Casualty Co., 419 S.W.2d 429 (Dallas Tex.Civ.App., 1967, n. r. e.); Houck v. State Farm Mutual Automobile Insurance Co., 394 S.W.2d 222 (Beaumont Tex.Civ.App., 1965, n. r. e.).

Since, as we have held, neither Chicago Bridge nor Thorpe is covered by the Travelers policy, the fact issue is immaterial.

The motions for rehearing filed by Chicago Bridge & Iron Company and J. T. Thorpe Company are granted and the judgment previously entered is withdrawn. The judgment of the Trial Court is reversed as to Travelers Insurance Company and judgment is here rendered that the Travelers Insurance Company go hence without day with its costs.

The judgment is affirmed as to all other parties.