Affirmed and Majority and Concurring and Dissenting Opinions filed July
21, 2009








Affirmed and Majority and Concurring and Dissenting Opinions
filed July 21, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-01006-CV

____________

 

MID-CONTINENT CASUALTY COMPANY, Appellant

 

V.

 

GLOBAL ENERCOM MANAGEMENT, INC., Appellee

 



 

On Appeal from the 215th
District Court

Harris County, Texas

Trial Court Cause No. 2002-65400

 



 

M A J O R I T Y   O P I N I O N

This case involves an insurance coverage dispute arising
out of a fatal accident that occurred on a work project in Arkansas.  Appellee,
Global Enercom Management, Inc., sought defense and indemnity from appellant,
Mid-Continent Casualty Company, under a commercial general liability policy and
a commercial auto policy issued to the subcontractor on the project, Allstates
Construction Company (AAllstates@).  When appellant
denied appellee=s requested defense and indemnity,
appellee filed a declaratory judgment action.  The parties ultimately filed
cross-motions for summary judgment.  The trial court granted appellee=s motion, denied
appellant=s, and appellant appealed.  Finding no error, we
affirm.








Factual and Procedural Background

In
December 2001, appellee transmitted a proposed subcontract to Allstates for
repair work to be performed on a cellular telephone tower in Forrest City,
Arkansas.  On December 27, 2001, Allstates signed the subcontract and returned
it to appellee.  Allstates= employees commenced work on the tower project prior to
Christmas Day, 2001.  After the Christmas vacation, the Allstates workers
returned to the project on January 2, 2002.  As part of the repair project, the
Allstates workers installed a pulley and rope system on the tower.  One end of
the pulley system was attached to a headache ball, which consists of a heavy
weight.  The other end was attached to a pick-up truck, which would provide the
power to raise and lower the headache ball.  An equipment building on the tower
site was between the headache ball end of the pulley system and the pick-up
truck.

During
the afternoon of January 2, the job site foreman, Forester Barnes, instructed
three workers, John Seabolt, Jamie Anders, and Brian Barnes, to climb to the
280 foot level of the tower to take measurements.  Approximately ten minutes
later, Barnes heard the signal to raise the headache ball.  Barnes then went to
the pick-up truck, started it, and started slowly backing the truck up to raise
the headache ball.  Barnes did not know where the three workers were or that
they had attached themselves to the headache ball.  When the headache ball had
been raised fifteen to twenty feet, the headache ball moved above the equipment
building and Barnes was able to see the three men attached to the headache
ball.  When they came into view, Barnes exchanged hand signals with the workers
asking what was going on?  The men signaled for Barnes to continue raising them
to the top of the tower.  Barnes then continued slowly backing the truck up
until the men had reached about the eighty foot elevation level.  At that
point, the rope broke and the men fell to their deaths. 

Allstates
performed no further work under the subcontract after January 2, 2002.  On
January 3, 2002, appellee signed the subcontract.








On
August 12, 2002, Anders= and Seabolts= heirs filed suit against appellee in federal district court
in Mississippi.  Appellee sought defense and indemnification from appellant,
Allstates= insurer, pursuant to an indemnity clause found in the subcontract. 
Appellant had insured Allstates with both a commercial general liability policy
(ACGL policy@) and a commercial automobile policy
(Aauto policy@).  Appellant denied coverage. 
Appellee then filed a declaratory judgment action in Texas state court. 
Appellant counterclaimed for declaratory judgment as well.  While the
declaratory judgment action was pending, appellee settled the Mississippi
lawsuit.

Eventually,
the two sides narrowed the issues in the declaratory judgment action down to
whether two exclusions of coverage applied.  Both exclusions are found in
section I, part 2 of the CGL policy:

Exclusion
b:

This
insurance does not apply to:

b.         Contractual Liability

ABodily injury@ or Aproperty damage@ for which the insured is obligated to pay damages by
reason of the assumption of liability in a contract or agreement.  This
exclusion does not apply to liability for damages:

* * *

(2)       Assumed in a contract or agreement that is an Ainsured contract@,
provided the Abodily injury@ or
Aproperty damage@
occurs subsequent to the execution of the contract or agreement.

Exclusion g:

ABodily injury@ or Aproperty damage@ arising out of the ownership, maintenance, use or
entrustment to others of any aircraft, Aauto@ or watercraft owned or operated by or rented or
loaned to any insured.  Use includes operation and Aloading or unloading@.

 








The same contractual
liability exclusion is also found in the auto policy.  Both sides filed
competing traditional motions for summary judgment on the applicability of the
exclusions.  The trial court ultimately granted appellee=s and denied appellant=s motion.  This appeal followed.

Discussion

Appellant
raises two issues on appeal.  First, appellant contends Exclusion g in the CGL
policy, the auto exclusion, applies to the Arkansas accident because a pick-up
truck was used to power the pulley system.  Next, appellant asserts the
contractual liability exclusion precludes coverage under both the CGL and auto
policies because appellee did not sign the subcontract until the day after the
Arkansas accident.

A.        Insurance Contract
Construction and the Standard of Review

Insurance
policies are construed according to the ordinary rules of contract
construction.  Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 157
(Tex. 2003).  In determining the scope of coverage, a court examines the policy
as a whole to ascertain the true intent of the parties.  Utica Nat=l Ins. Co. of Texas v. Am. Indem. Co., 141 S.W.3d 198, 202 (Tex. 2004) citing
Mid-Century Ins. Co. v. Lindsey, 997 S.W.2d 153, 158 (Tex. 1999).  To
determine this intent, we generally limit our inquiry to the Afour corners@ of the policy.  See Esquivel v.
Murray Guard Inc., 992 S.W.2d 536, 544 (Tex. App.CHouston [14th Dist.] 1999, pet.
denied).  When dealing with an exclusionary clause, a court must adopt the
construction urged by the insured as long as that construction is not
unreasonable, even if the construction urged by the insurer appears to be more
reasonable or a more accurate reflection of the parties= intent.  Utica Nat=l Ins., 141 S.W.3d at 202 citing Nat=l Union Fire Ins. Co. v. Hudson
Energy Co., 811
S.W.2d 552, 555 (Tex. 1991).  Because this case deals with exclusions, the
appellant insurance company bears the burden of proof to establish that the
exclusions apply in this case.  Id. at 204.








Declaratory
judgments decided by summary judgment are reviewed under the same standards of
review that govern summary judgments generally.  Tex. Civ. Prac. & Rem.
Code Ann. ' 37.010 (Vernon 2006); Lidawi v. Progressive County Mut. Ins. Co.,
112 S.W.3d 725, 730 (Tex. App.CHouston [14th Dist.] 2003, no pet.).  Under the traditional
summary judgment standard of review, a movant has the burden to show at the
trial level that there are no genuine issues of material fact, and it is
entitled to judgment as a matter of law.  KPMG Peat Marwick v. Harrison
County Hous. Fin. Corp., 988 S.W.2d 746, 748 (Tex. 1999).  In determining
whether there is a genuine fact issue precluding summary judgment, evidence
favorable to the non-movant is taken as true and we make all reasonable
inferences in his favor.  Id.  We review the trial court=s summary judgment de novo.  Valence
Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).  A movant is
entitled to summary judgment only if it conclusively proves all essential
elements of its claim.  Johnston v. Crook, 93 S.W.3d 263, 273 (Tex. App.CHouston [14th Dist.] 2002, pet.
denied).

When
both parties move for summary judgment, each party bears the burden of
establishing that it is entitled to judgment as a matter of law.  City of
Garland v. Dallas Morning News, 22 S.W.3d 351, 356 (Tex. 2000).  When the
trial court grants one motion and denies the other, we review the summary
judgment evidence presented by both parties and determine all questions
presented.  Id.  The reviewing court should render the judgment that the
trial court should have rendered or reverse and remand if neither party has met
its summary judgment burden.  Id.

B.        Exclusion Ag,@ the Auto Exclusion

The
trial court, by granting appellee=s motion for summary judgment,
decided Exclusion g did not apply.  The parties agree the resolution of this
issue is guided by the test found in the Lindsey case cited above. 
There, the Supreme Court held:

For an
injury to fall within the Ause@ coverage of an automobile policy,

(1)       the accident must have arisen out of the inherent nature of
the automobile, as such,








(2)       the accident must have arisen within the natural territorial
limits of an automobile, and the actual use must not have terminated,

(3)       the automobile must not merely contribute to cause the condition
which produces the injury, but must itself produce the injury.

Lindsey, 997 S.W.2d at 157.

In Lindsey,
a young boy climbed through the back window of a pick-up, which dislodged a gun
from a gun rack, which in turn discharged, hitting another boy sitting in a car
parked next to the pick-up.  The injured boy=s family settled with the pick-up
owner for the limits of that insurance policy.  The settlement fell far short
of the amount needed to pay the injured boy=s medical expenses so the family
sought coverage under their own Uninsured/Underinsured Motorist Policy.  The
insurance company denied coverage because the injury did not involve the Ause@ of an automobile.  The Supreme Court
disagreed, holding the incident met all three elements.  In the process, the
Supreme Court distinguished an entire line of cases addressing drive-by
shootings, which consistently held they did not involve the Ause@ of an automobile, by stating:

[a]
drive-by shooting involves a vehicle only incidentally.  The shooter could be
standing still and accomplish the same result.  In such a situation, even if
the first two factors of the Appleman/Couch[1]
test were satisfied, the third could not be because the vehicle=s role in the occurrence is minimal as compared with
the shooter=s.

Lindsey, 997 S.W.2d at 158.[2]








The
result in Lindsey does not determine the result here.  In Brown v.
H.I.S.D., this court affirmed the trial court=s determination that the school
district was immune from liability in a suit filed by a victim of a sexual
assault perpetrated by a school district police officer who used his district
patrol car to pull the victim over.  Brown v. H.I.S.D., 123 S.W.3d 618,
622B23 (Tex. App.CHouston [14th Dist.] 2003, pet.
denied).  The victim argued the Texas Tort Claims Act (ATTCA@) applied because the incident
involved the use of a motor vehicle.  Id. at 619.  This court held the
TTCA did not apply because, while the incident did involve a motor vehicle, the
motor vehicle did not actually cause the victim=s injuries.  Id. at 622.  In
the process, we distinguished the result in Lindsey because the Supreme
Court Arelied on a line of insurance
coverage cases in which a gun was discharged in or from vehicles.@  Id. at 621.  Finally, we
limited Lindsey to its facts by holding Awe believe [Lindsey] may be of
limited use outside the context in which it occurred.  The accidental discharge
of firearms has produced a whole body of case law in which insurance coverage
was the issue.  This body of law ultimately controlledBor at least directedBthe outcome in [Lindsey].@  Id.  The court then applied
the three element Lindsey test and determined (1) the incident did not
occur within the territorial limits of the patrol car (the assault actually
occurred in the victim=s vehicle), and (2) the patrol car did not itself produce the
injury, but only assisted the officer in accomplishing his unlawful purpose.  Id.
at 622B623.








The
result in this case is determined by Brown, the line of drive-by
shooting cases distinguished by the Supreme Court in Lindsey, and a
second, earlier Supreme Court case, Nat=l Union Fire Ins. Co. of Pittsburgh,
Pa. v. Merchs. Fast Motor Lines, Inc., 939 S.W.2d 139 (Tex. 1997).  In Merchants, a
truck driver negligently fired a gun while driving his truck, which struck and
killed a person riding in a vehicle traveling next to the truck.  Merchs.,
939 S.W.2d at 141.  The Supreme Court held there was no duty to defend because
the petition did not allege facts showing the injury was the result of the use
of a vehicle.  Id. at 142.  Here, the pick-up truck did not cause the
deaths of the three workers, the defective rope did.  Instead, the pick-up
truck simply provided the power for the pulley system, which is not enough to
constitute Ause@ under the CGL policy.  See Collier v. Employers Nat=l Ins. Co., 861 S.W.2d 286, 289 (Tex. App.CHouston [14th Dist.] 1993, writ
denied).  Therefore, even assuming the facts of this case meet the first two Lindsey
requirements, we hold they do not meet the third requirement, that the vehicle
actually produce the injury rather than merely contribute to it.  Because the
workers= deaths did not arise out of the use
of a motor vehicle, we overrule appellant=s first issue.  

C.        The Contract Exclusion

In its
second issue, appellant contends the contract exclusion precludes coverage
because only one party, Allstates, had actually signed the subcontract prior to
the underlying incident.  According to appellant, to meet the execution
requirement found in the insurance policies, both appellee and Allstates had to
physically sign the subcontract prior to the incident.  We disagree.

Initially,
appellee forwarded the subcontract to Allstates and Allstates signed the
subcontract on December 27, 2001 and returned it to appellee.  The term Aexecution@ is not defined in the subcontract or
in the insurance policies.  It is undisputed both parties were performing under
the subcontract when the underlying incident occurred on January 2, 2002. 
Finally, it is undisputed appellee signed the contract on January 3, 2002.

This
issue is resolved by two similar cases: Travelers Ins. Co. v. Chi. Bridge
& Iron Co., 442 S.W.2d 888 (Tex. Civ. App.CHouston [1st Dist.] 1969, writ ref=d n.r.e.) and ABB Kraftwerke
Aktiengesellschaft v. Brownsville Barge & Crane, Inc., 115 S.W.3d 287
(Tex. App.CCorpus Christi 2003, pet. denied).








In Travelers,
Chicago Bridge and J. T. Thorpe Co. agreed Thorpe could use certain equipment
owned by Chicago Bridge provided Thorpe executed a printed rental agreement.  Travelers,
442 S.W.2d at 890B91.  Prior to the accident at issue in that case, Chicago
Bridge=s representative signed the
agreement, while Thorpe=s representative only signed after the accident.  Id.
at 891.  Following the incident, Thorpe=s insurance company denied coverage,
arguing the insurance policy required both parties to sign a written agreement
prior to the incident.  Id.  The court of appeals disagreed stating that
the parties were performing under the contract prior to the incident and there
was a written agreement.  The court continued that there was evidence from
which an inference could be drawn that the parties intended the contract to be
in writing and to be effective from the time the equipment was first used by
Thorpe.  Id. at 897.

In Brownsville
Barge, the contract was prepared by Brownsville Barge and sent to ABB,
which signed the contract and returned it to Brownsville Barge.  Brownsville
Barge, 115 S.W.3d at 292.  The court concluded ABB accepted the contract
even though Brownsville Barge never signed it.  Id.  The court held that
as long as both parties gave their consent to the terms and there is no
evidence of an intent to require both signatures as a condition precedent,
signatures are not required in the making of a valid contract.  Id. 

Because
(1) the term Aexecution@ is not defined in either the CGL policy or the auto policy,
(2) there is no language in the policies requiring both parties to sign the
contract, (3) Texas law does not require the parties to a contract to actually
sign for a contract to be valid and enforceable, and (4) there was no summary
judgment evidence raising a fact issue of the parties= intent to require both signatures as
a condition precedent, in fact the evidence established the exact opposite,  we
conclude appellant=s construction of the insurance policies is incorrect.  See
Travelers, 442 S.W.2d at 890B91.  Accordingly, we hold that, under
Texas law, the subcontract was executed prior to the January 2, 2002 incident
and we overrule appellant=s second issue.

 

 

 

 

 

 








Conclusion

Having overruled both of appellant=s issues on
appeal, we affirm the trial court=s final judgment.

 

 

 

/s/      John S. Anderson

Justice

 

 

 

 

Panel consists of
Chief Justice Hedges and Justices Anderson and Seymore.

 

 









[1]  See JOHN A. APPLEMAN, INSURANCE LAW AND
PRACTICE (Buckley ed.) ' 4317, at 367B69
(1979); 8 COUCH ON INSURANCE 3D '
119.37, at 119B56 (1997).





[2]  See Le v. Tex. County Mut. Ins. Co., 936
S.W.2d 317, 321 (Tex. App.CHouston [1st
Dist.] 1996, writ denied) (holding that the Ause@ requirement of uninsured motorist coverage is not
satisfied by a drive-by shooting because the gun was the instrumentality that
caused the injuries, not the car); see also Collier v. Employers Nat=l Ins. Co.,
861 S.W.2d 286, 289 (Tex. App.CHouston [14th
Dist.] 1993, writ denied) (holding that a drive-by shooting does not involve
the use of a motor vehicle simply because an automobile provided the site for a
criminal assault or provided transportation to the location of a criminal act).