UTICA NATIONAL INSURANCE
COMPANY OF TEXAS,
Petitioner,

v.

AMERICAN INDEMNITY COMPANY
and Texas Property & Casualty Insur-
ance Guaranty Association, Respon-
dents.

No. 02–0090.

Supreme Court of Texas.

Argued Jan. 15, 2003.

Decided July 9, 2004.

Rehearing Denied Sept. 3, 2004.

Robert G. Hogue, Robert G. Hogue, P.C., Dallas, for Amicus Curiae.

Fred A. Simpson, Houston, pro se.

Dana C. Livingston Cobb, Douglas Alexander, J. Woodfin Jones, Alexander Dubose Jones & Townsend, LLP, Austin, Alexander N. Beard, E. Thomas Bishop, Michael A. Hummert, Bishop & Hummert, P.C., Dallas, for Petitioner.

Thomas D. Caudle, Mateer & Shaffer, L.L.P., Dallas, and Daniel Jordan, Jordan Quinn & Carmona, P.C., Austin, for Respondent.

Chief Justice PHILLIPS delivered the opinion of the Court, in which Justice O'NEILL, Justice JEFFERSON, Justice SCHNEIDER, Justice SMITH, Justice WAINWRIGHT, and Justice BRISTER joined.

On motion for rehearing we withdraw our opinion of June 26, 2003, and substitute the following.

In this case, we must interpret the scope of a professional services exclusion in a general liability insurance policy. The insurer argues that the court of appeals erred in affirming the trial court's judgment that it had a duty to defend and to indemnify its insured, a doctors' association, against a claim filed by patients who were injured by the administration of contaminated anesthetics. The insurer relies on a provision in its policy excluding coverage for any "[b]odily injury ... due to rendering or failure to render any professional service." This exclusion, the insurer asserts, precludes coverage any time a patient's medical treatment is a but-for cause

of an injury, even if the professional services themselves have been rendered to the patients with all due care.

We do not share such a narrow view of the language. We conclude that the policy excludes coverage only when the insured has breached the standard of care in rendering those professional services. In this case, the allegations in the pleadings raised both the possibility that the treating doctors were negligent in their administration of the drug and the possibility that the doctors' association was negligent in the storage of that drug. Because the plaintiffs alleged both professional and non-professional negligence, the general liability insurer had a duty to defend the underlying suit in this case under the eight-corners doctrine. But because a fact issue exists about whether the patients' injuries were caused at least in part by the doctors' rendition of professional services, in which event the insurer's policy would not cover the doctors' association, we remand the indemnity claims to the trial court for further proceedings.

## I

In late 1991 and early 1992, Mid–Cities Surgi–Center (the surgical center) employed a scrub technician, David Wayne Thomas, who stole fentanyl, an anesthetic, from the surgical center. Apparently using the same syringe, Thomas removed fentanyl from the glass ampoules in which it was stored, injected himself with the drug, then injected saline solution back into the ampoules to hide his theft. Thomas then re-sealed the ampoules with super glue and re-wrapped them with cellophane to further hide his crime. Because Thomas was infected with Hepatitis C, his use of a dirty syringe allegedly contaminated the ampoules.

After Thomas's crime was discovered, he pleaded guilty to stealing the drugs and went to prison. A number of patients who received fentanyl injections before Thomas's crime was discovered subsequently tested positive for Hepatitis C. This lawsuit deals with the claims of four patients against Mid–Cities Anesthesiology, P.A., a professional association of ten doctors who practiced anesthesia at the surgical center, and the association's member anesthesiologists (hereinafter collectively called the doctors' association).[1] The patients alleged numerous negligent actions against the doctors' association and its members, including negligence in "failing to properly secure anesthesia narcotics" and in "exposing patients to contaminated medication." The association's professional liability insurer originally assumed defense of the suit, but later became insolvent. The Texas Property and Casualty Insurance Guaranty Association (TPCIGA) then assumed its obligations.

TPCIGA first tendered the suit for a defense and coverage to American Indemnity Co., the association's general liability insurer at the time of litigation. American Indemnity originally denied coverage, ar-

---

1. In addition to the doctors' association, forty-four infected patients also sued the surgical center, the corporate owners of the surgical center, the medical director of the surgical center's corporate owner, the surgical center's head pharmacist, the corporation that managed the surgical center's pharmacy, and David Wayne Thomas. The case in this Court deals with a settlement made between four of the original forty-four plaintiffs and the doctor's association and its members. The record in this case does not tell us exactly what became of the other forty patient's claims, though it does show that TPCIGA paid some additional settlement money to other patients. The record also does not reflect whether the four patients who settled with the doctor's association either settled with, or proceeded against, the other defendants.

guing that its policy was not yet effective when the patients became infected. The defense was then tendered to Utica National Insurance Company, the general insurer at the time of the infection. Utica also refused to assume the defense, arguing that its policy exclusion for any injury caused by the rendition of professional services precluded any possible coverage. Subsequently, American Indemnity agreed to assist TPCIGA in settling these claims. Together TPCIGA and American Indemnity settled the case against the doctors' association for approximately one million dollars. Utica did not participate in the settlement.

American Indemnity then filed this suit against Utica and TPCIGA, seeking reimbursement from Utica for the settlement costs and a judgment declaring the respective rights and obligations of all three insurance companies for defense of the underlying suit. TPCIGA filed a cross-claim against Utica for its defense and settlement costs and a counter-claim against American Indemnity for defense costs. American Indemnity and TPCIGA settled their claims against each other, and both companies proceeded against Utica.

All three parties moved for summary judgment. The trial court denied Utica's motion and granted TPCIGA's and American Indemnity's motions, holding that Utica breached its obligation to defend and was therefore liable for defense costs. The trial court also held that Utica's professional services exclusion did not preclude coverage of the claims, and further granted summary judgment to American Indemnity and TPCIGA for the full cost of their settlement, together with attorneys' fees and pre- and post-judgment interest. The court of appeals affirmed the judgment. 110 S.W.3d 450.

## II

A liability insurer is obligated to defend a suit if the facts alleged in the pleadings would give rise to any claim within the coverage of the policy. *Nat'l Union Fire Ins. Co. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997). In this case, the parties disagree about whether the facts alleged in the pleadings could potentially give rise to a claim covered by Utica's general liability policy. Utica's policy generally covered liability for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage,' 'personal injury,' or 'advertising injury,' to which this insurance applies." The policy contained several exclusions, including one which specified that the policy "does not apply" to any "[b]odily injury ... due to rendering or failure to render any professional service ... [including but] not limited to ... [a]ny health service or treatment." TPCIGA and American Indemnity argue that this exclusion is intended to prevent any overlap between the association's general liability insurance and its professional malpractice insurance. Under TPCIGA and American Indemnity's argument, therefore, the exclusion would only preclude coverage when the plaintiff's injury is caused by the breach of a professional standard of care. Here, TPCIGA and American Indemnity agree that a claim for the doctors' negligent administration of the anesthesia would be excluded from Utica's policy. But they assert that negligence in failing to secure the cabinets does not implicate a professional standard of care. Because the injured patients also alleged that the doctors' association was negligent in failing to secure the cabinets, TPCIGA and American Indemnity argue that Utica had a duty to defend the claim.

In this appeal, Utica does not dispute that its general liability policy could cover a claim for the negligent failure to store or

secure drugs.[2] But Utica argues that its policy precludes coverage for a claim of negligent storage in this particular case because the doctors later rendered a professional service by injecting the patients with the anesthetic. Utica points to the policy language which excludes injury due to professional services, noting that (1) the injection of fentanyl was a health service, and therefore a professional service as defined by the policy, and (2) the injection was a but for cause of the infection—without the injection, the patients could not have been infected with Hepatitis C. Because the professional service was a but-for cause of the injury, Utica argues that coverage is excluded even if that professional service were rendered with all due care. Thus, Utica concludes that it had no duty to defend because the pleadings negated any possibility of coverage.

■ In determining the scope of coverage, we examine the policy as a whole to ascertain the true intent of the parties. *Mid–Century Ins. Co. v. Lindsey,* 997 S.W.2d 153, 158 (Tex.1999) ("Fundamentally, of course, the issue is what coverage is intended to be provided by insurers and acquired and shared by premium payers."); *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex. 1995) ("Insurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally. The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument.") Reasonable expectations are often affected by the conditions surrounding the formation of the policy language and by the type of clause at issue. Here, Utica did not draft its own policy, choosing instead to adopt a policy form prescribed by the State Board of Insurance. *See* Tex. Ins.Code art. 5.13–2 § 8(e) (providing broad authority to the Texas Insurance Commissioner to set rates for business liability insurance and to "promulgate standard insurance policy forms ... that may be used, at the discretion of the insurer, instead of the insurer's own forms in writing insurance subject to this article.").

■ Furthermore, this is an exclusionary clause. "The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991). We conclude that TPCIGA and American Indemnity's interpretation—that the policy excludes coverage only when the plaintiff's injury is caused by the breach of a professional standard of care—is reasonable.

■ The policy language supports the conclusion that the exclusion can be reasonably read to preclude coverage only when the plaintiff's injury is caused by the breach of a professional standard of care. The policy excludes injury "due to" the rendition of professional services. TPCIGA and American Indemnity's argument that bodily injury "due to" professional

**2.** As the dissent notes, securing pharmaceuticals may implicate a professional duty. In fact, Utica complained to the court of appeals that failure to secure medications also fell within the scope of the professional services exclusion. However, Utica does not present that argument in this Court. Rather, Utica concedes for purposes of this appeal that such a claim would not be *per se* excluded by the professional services exclusion. We therefore express no opinion whether the failure to secure medication would implicate a general or a professional standard of care, but instead we accept the parties' contention that such failure would implicate a general duty.

services requires more than simple cause in fact is supported by other policy exclusions which appear to be drawn more broadly, excluding harm "arising out of" conduct instead of "due to" that conduct. For example, the policy excludes bodily injury "arising out of the actual, alleged, or threatened discharge ... of pollutants" and bodily injury "arising out of the ownership, maintenance, use or entrustment" of an automobile. To us, the different wording in these exclusions is significant.

This Court has held that "arise out of" means that there is simply a "causal connection or relation," *Mid–Century Insurance Co.*, 997 S.W.2d at 156 (Tex.1999), which is interpreted to mean that there is but for causation, though not necessarily direct or proximate causation. *See McCarthy Bros. Co. v. Cont'l Lloyds Ins. Co.*, 7 S.W.3d 725, 730 (Tex.App.-Austin 1999, no pet.); *see also Admiral Ins. Co. v. Trident NGL, Inc.*, 988 S.W.2d 451, 454 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). Other jurisdictions also interpret "arising out of" to exclude a proximate cause requirement. *See McCarthy Bros.*, 7 S.W.3d at 729–30; *see also* 1 Rowland H. Long, The Law Of Liability Insurance § 1.24 (1991) ("The phrase 'arising out of' is not equivalent to 'proximately caused by.' ... ' "But for" causation, *i.e.*, a cause and result relationship, is enough to satisfy the provision of the policy.' ") (quoting *Mfrs. Cas. Ins. Co. v. Goodville Cas. Co.*, 403 Pa. 603, 170 A.2d 571 (1961)). Likewise, the United States Court of Appeals for the Fifth Circuit has concluded that " '[a]rising out of' are words of much broader significance than 'caused by.' " *Red Ball Motor Freight, Inc. v. Employers Mut. Liab. Ins. Co.*, 189 F.2d 374, 378 (5th Cir.1951); *see also Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 370 (5th Cir.1998). Since the policy used different wording— "arising out of" versus "due to" in parallel exclusions—we conclude that the phrases

should have different meanings in the context of this policy. The most reasonable conclusion is that "due to" requires a more direct type of causation that could tie the insured's liability to the manner in which the services were performed. We therefore reject Utica's argument that the professional services rendered after the alleged negligent storage relieved it of the duty to defend.

We thus conclude that TPCIGA and American Indemnity have more than met their burden to show that their interpretation of the exclusionary provision was reasonable. We agree with the court of appeals' holding that the trial court properly held Utica liable for its share of the defense costs.

### III

Merely because Utica had a duty to defend the underlying suit, however, does not mean that it was obligated to indemnify its insured for the settlement. The duty to defend and the duty to indemnify "are distinct and separate duties." *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex.2002); *see also Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821–22 (Tex.1997). Even if a liability insurer breaches its duty to defend, the party seeking indemnity still bears the burden to prove coverage if the insurer contests it. *Employers Cas. Co. v. Block*, 744 S.W.2d 940, 943–44 (Tex.1988), overruled on other grounds by *State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 714 (Tex.1996); *see also Tex. Farmers Ins. Co. v. McGuire*, 744 S.W.2d 601, 602–03 (Tex.1988) ("The doctrine of estoppel cannot be used to create insurance coverage when none exists by the terms of the policy.").

At trial, both parties argued that the indemnity question could be decided as a matter of law. But we believe that the

coverage determination depends on a factual resolution of whether the patients' infection was caused by the doctors' breach of a professional standard of care. This Court has noted previously that the question of coverage—and therefore indemnity—often turns on the resolution of factual questions:

> It may sometimes be necessary to defer resolution of indemnity issues until the liability litigation is resolved. In some cases, coverage may turn on facts actually proven in the underlying lawsuit. For example, the plaintiff may allege both negligent conduct and intentional conduct; a judgment based upon the former type of conduct often triggers the duty to indemnify, while a judgment based on the latter usually establishes the lack of a duty.

*Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex.1997). Here, because Utica's policy treats the professional services exclusion as an exception to coverage, Utica bears the burden of proof to establish that the exclusion applies in this case. Tex. Ins.Code art. 21.58(b); Tex.R. Civ. P. 94.

■ The injured patients alleged both professional and general liability. TPCIGA argues that the plaintiffs alleged covered and excluded causes which separately caused their injuries, regardless of whether the doctors breached a professional standard of care. Texas courts and the Fifth Circuit applying Texas law have recognized a distinction between cases involving "separate and independent" causation and "concurrent" causation when both covered and covered and excluded events cause a plaintiff's injuries. In cases involving separate and independent causation, the covered event and the excluded event each independently cause the plaintiff's injury, and the insurer must provide coverage despite the exclusion. *See Guaranty*

*Nat'l Ins. Co. v. North River Ins. Co.*, 909 F.2d 133, 137 (5th Cir.1990) (holding that a hospital's failure to secure windows and to properly supervise a psychiatric patient both proximately caused her suicide and thus a professional exclusion did not apply); *Warrilow v. Norrell*, 791 S.W.2d 515, 526 (Tex.App.-Corpus Christi 1989, writ denied); *Cagle v. Commercial Standard Ins. Co.*, 427 S.W.2d 939, 943–44 (Tex.Civ. App.-Austin 1968, no writ). In cases involving concurrent causation, the excluded and covered events combine to cause the plaintiff's injuries. Because the two causes cannot be separated, the exclusion is triggered. *See Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 771–72 (5th Cir.1999) (holding that, under Texas law, liability for failing to follow separate corporate safety standards was necessarily derivative of excluded negligent driving claim); *Burlington Ins. Co. v. Mexican Am. Unity Council*, 905 S.W.2d 359, 363 (Tex.App.-San Antonio 1995, no writ) (holding that, because negligent supervision of youth home resident and the assault and battery which caused her injuries were not "separate and independent," an assault and battery exclusion applied); *Thornhill v. Houston Gen. Lloyds*, 802 S.W.2d 127, 130 (Tex.App.-Fort Worth 1991, no writ) (holding that, because the claims were "related and interdependent," sale-to-minors exclusion in general liability policy applied to claims that a store was negligent in selling alcohol to minors as well as training its employee on permissible purchases).

We recognize the distinction that TPCIGA urges. However, without a finding that the doctors did or did not breach a professional standard of care, we cannot determine whether this case involves concurrent causes. A determination by the finder of fact that the infection was caused by the breach of a professional standard of care—for example, a finding that the infec-

tion was caused by the doctors' negligent administration of the anesthetic—would negate Utica's duty to indemnify. If the factfinder determines that the doctors breached both professional and non-professional standards of care by failing to properly supervise Thomas and by exposing the plaintiffs to contaminated fentanyl, then the covered and excluded events would have concurrently caused the harm the plaintiffs suffered, and the exclusion would apply. If, however, the professional services were rendered with due care, then the exclusion would not apply.

## IV

We conclude that Utica's general liability policy excluded coverage for any injury caused by the breach of a professional standard of care. Because the plaintiffs' pleadings in the underlying dispute alleged a cause of action that could establish liability for the doctors' association even in the absence of such a breach, we affirm that part of the court of appeals' judgment holding that Utica had a duty to defend the case. Because we disagree with the court of appeals that this record established Utica's indemnity obligation as a matter of law, we reverse that part of the court of appeals' judgment and remand this case to the trial court to determine Utica's indemnity obligation.

Justice HECHT filed a dissenting opinion, in which Justice OWEN joined.*

Justice HECHT, joined by Justice OWEN, dissenting.

Four patients alleged that they contracted Hepatitis C from injections of fentanyl, an anesthetic, that was contaminated by a surgical technician, David Wayne Thomas, while stealing the drug for his own use. The patients asserted that their respective treating physicians, and the other anesthesiologists with whom they associated in Mid–Cities Anesthesiology, P.A.-ten of them altogether-were negligent in not securing the drug and supervising Thomas so as to prevent the contamination. The association and its members carried commercial general liability (CGL) insurance and professional liability insurance. The patients have settled, and the only remaining dispute is between the insurers over which of them was obligated to defend and indemnify the claims. One of the CGL carriers, Utica National Insurance Co., contends that the claims were not covered by its policy. The other CGL carrier, American Indemnity Co., and the receiver for the professional liability carrier, Texas Property and Casualty Insurance Guaranty Association, disagree.

In my view, if the association and its member physicians were negligent in failing to prevent the contamination of a drug they used in medical treatment, it was because they breached a professional standard of care, whether the injured patients were theirs or their associates', and not because they breached some ordinary duty of care that they may have owed irrespective of their medical training and practice.[1] Utica concedes in this Court that it might be possible for a physician to fail to secure drugs properly and yet violate only an ordinary duty of care, not a professional standard. Perhaps so. Maybe allowing liquid drugs to leak or pills to spill so that someone slips and falls does not involve a professional standard of care. Utica concedes the point in reliance on the strength

---

* Justice Enoch, who participated in the original decision in this case, resigned his office on October 1, 2003, and did not participate in the motion for rehearing.

1. Cf. Harris Methodist Health Sys. v. Employers Reinsurance Corp., No. 3:96–CV–0054–R, 1997 WL 446459, 1997 U.S. Dist. Lexis 23660 (N.D.Tex. July 25, 1997) (holding that claims against a hospital for injury caused by David Wayne Thomas's criminal activities were professional liability claims).

of its argument that even if the patients' injuries were caused in part by non-professional negligence, such negligence was necessarily concurrent with professional negligence and therefore outside the coverage of its CGL policy, based on the line of cases the Court cites.[2] The Court takes Utica's concession[3] and then disagrees with its argument, concluding that the patients' injuries may have been caused by non-professional negligence *only*. I cannot see how it is remotely possible for a physician to be negligent in preserving the purity of medications administered to patients by himself and those with whom he associates and yet not be in breach of a professional standard of care.

Thus, I would hold that the patients' claims were for professional liability, against which Utica had no obligation under its CGL policy to defend or indemnify. The Court does not foreclose this result but remands for fact findings. If I am correct-if the association and its members could not have been negligent without violating a professional standard of care-the outcome will eventually be the same. I remain troubled by the way the Court goes about reading insurance policies, which we constantly reiterate must be interpreted and construed like other contracts,[4] but which hardly ever are because courts approach them, not as neutral arbiters of words on a page, but in hopes there will be coverage.

The standard form Texas Business owners Policy of commercial general liability insurance that is available to businesses of all types and that Utica National Insurance Co. issued to Mid–Cities Anesthesiology, P.A. and its ten member anesthesiologists excluded from coverage " '[b]odily injury' ... due to rendering or failure to render any professional service". According to the Court, what the exclusion really means is that the policy does not cover "[b]odily injury ... due to rendering or failure to render any professional service *in breach of the professional standard of care*". This is by no means a simple clarification; the Court's added phrase changes the meaning significantly. As written, the exclusion applies to *any* professional service; as rewritten by the Court, it applies only to any *negligent* professional service. Why? Because, the Court explains, "due

**2.** *Ante* at 200.

**3.** *Ante* at 202 n. 2.

**4.** *Ante* at 202 (citing *National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995) ("Insurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally."); *accord, e.g., American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003) ("We interpret insurance policies in Texas according to the rules of contract construction."); *Progressive County Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex.2003) ("It is well settled that the general rules of contract construction apply to the interpretation of insurance contracts."); *Texas Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex. 1999) ("In Texas, insurance contract interpretation is governed by general contract interpretation rules."); *Balandran v. Safeco Ins.*

*Co. of Am.*, 972 S.W.2d 738, 740–741 (Tex. 1998) ("[I]nsurance contracts are subject to the same rules of construction as other contracts."); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.1994) ("Interpretation of insurance contracts in Texas is governed by the same rules as interpretation of other contracts."); *National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) ("Generally, a contract of insurance is subject to the same rules of construction as other contracts."); *Western Reserve Life Ins. Co. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554, 557 (1953) ("It s the settled law in this state that contracts of insurance in their construction are governed by the same rules as other contracts, and that terms used in them are to be given their plain, ordinary and generally accepted meaning unless the instrument itself shows them to have been used in a technical or different sense.".

to" implies a closer causal connection than "arising out of", another phrase used in the policy. The Court may be correct about the difference between the two phrases. A patient's slip and fall in a physician's office might be argued to "arise out of" the rendition of professional services simply because the patient was on the premises for purposes of treatment but could not be said to be "due to" the rendition of professional services unless the medical treatment (or failure to treat) directly caused the injury, say, by making the patient woozy and apt to fall. But to use this difference in the connection between events to define "professional services" is simply a non sequitur. There is no rational relationship between the meaning of "due to" and the meaning of "professional service". Whether "professional service" means *any* professional service or only professional service in breach of a professional standard of care has nothing whatever to do with whether "due to" means the same thing as "arising out of". The policy could have been written to exclude coverage for bodily injury any one of three ways, either:

(1) due to rendering or failing to render any professional service; or

(2) arising out of rendering or failing to render any professional service; or

(3) due to rendering or failing to render any professional service in breach of the standard of professional care.

The Court concludes that because (1) does not mean (2), (1) must mean (3). It is not clear why, assuming (1) does not mean (2), (1) should not mean (1).

Nor is it clear why either of the two generalities support its construction of the policy language. The Court says it " 'must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable' ".[5] We have made clear that this is true only if the exclusionary clause is ambiguous:

> Where an ambiguity involves an exclusionary provision of an insurance policy, we "must adopt the construction ... urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." [6]

If an exclusionary clause is clear, we cannot ignore its plain meaning just because someone can imagine some other construction that is not unreasonable. No one argues in this case that the exclusionary clause is ambiguous. Importantly, it is not the resulting coverage that must not be unreasonable, otherwise policy language would not mean much. Earlier this Term, in *American Manufacturers Mutual Insurance Co. v. Schaefer*, the insureds argued that an insurer's obligation under a standard automobile policy to "repair" a damaged vehicle should include compensation for loss in value.[7] Such coverage would not be unreasonable, but it cannot fit within the meaning of "repair". Likewise, there is nothing unreasonable about the broader coverage the Court creates by rewriting the exclusionary clause here. Utica could reasonably have offered it, and Mid–Cities Anesthesiology could reasonably have bought it. But the rule is that the insured's construction *of the exclusionary clause*—that is, the reading of the words on the page—must not be unreason-

---

5. *Ante* at 202 (citing *National Union Fire Ins. Co.*, 811 S.W.2d at 555).

6. *Balandran*, 972 S.W.2d at 741 (alteration in original) (quoting *National Union Fire Ins. Co.*, 811 S.W.2d at 555).

7. 124 S.W.3d 154, 162 (Tex.2003).

able. And it is simply not a reasonable construction of the English language to say that "any professional service" means the same thing as "any professional service in breach of the professional standard of care". "Any" does not mean "some", even in insurance policies.

The Court adds: "Reasonable expectations are often affected by the conditions surrounding the formation of the policy language and by the type of clause at issue." [8] I must confess that I have no idea what the Court intends by this statement, which is made without reference to authority. Standing alone, it is a truism: reasonable expectations are, indeed, often affected by such things. But the statement might be taken to imply that someone's reasonable expectations—probably an insured's, and probably not an insurer's—have something to do with determining the coverage afforded despite the policy language. That implication risks tension with the Court's prior pronouncement that " 'an insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous'." [9] No one argues here, and the Court does not conclude, that the exclusionary clause in Utica's policy was ambiguous. The policy form was prescribed by the State Board of Insurance, the conditions surrounding the formation of the policy language are unknown, the clause is what it is, and one can search the whole policy from beginning to end and still not find

anything to indicate that the Board or Utica or Mid–Cities Anesthesiology intended for "any professional service" to mean anything other than just that.

In *Schaefer,* a unanimous Court wrote: "we may neither rewrite the parties' contract nor add to its language." [10] The Court is no more careful in applying its own opinions than it is in construing insurance polices. What the Justices in today's majority really meant by the assertion in *Schaefer* was that "we may neither rewrite the parties' contract nor add to its language *unless we believe we should.*" One way or the other, the Court must add a few words to its *Schaefer* opinion so that it can add a few words to Utica's policy.

I respectfully dissent.

---

8. *Ante* at 202.

9. *Murphy,* 996 S.W.2d at 878 (Tex.1999) (quoting *McAllister v. Millville Mut. Ins. Co.,* 433 Pa.Super. 330, 640 A.2d 1283, 1288 (1994)); *see also Wilkie v. Auto–Owners Ins. Co.,* 469 Mich. 41, 664 N.W.2d 776, 782 (2003) ("his approach, where judges divine the parties' reasonable expectations and then rewrite the contract accordingly, is contrary to the bedrock principle of American contract

law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy.".

10. *Schaefer,* 124 S.W.3d at 162 (citing *Royal Indem. Co. v. Marshall,* 388 S.W.2d 176, 181 (Tex.1965) ("Courts cannot make new contracts between the parties, but must enforce the contracts as written.")).