**MID–CONTINENT CASUALTY COMPANY, Appellant**

v.

**GLOBAL ENERCOM MANAGEMENT, INC., Appellee.**

**No. 14–07–01006–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

July 21, 2009.

---

**3.** Thomas made other allegations that do sound in contract and do ask for economic damages, but Thomas has abandoned those claims on appeal.

Kelly J. Friedman, Mike Johnson, Sugar Land, TX, Jennifer Bruch Hogan, Matthew E. Coveler, Houston, TX, for appellants.

John K. Woodard, Houston, TX, for appellees.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and SEYMORE.

## MAJORITY OPINION

JOHN S. ANDERSON, Justice.

This case involves an insurance coverage dispute arising out of a fatal accident that occurred on a work project in Arkansas. Appellee, Global Enercom Management, Inc., sought defense and indemnity from appellant, Mid–Continent Casualty Company, under a commercial general liability policy and a commercial auto policy issued to the subcontractor on the project, Allstates Construction Company ("Allstates"). When appellant denied appellee's requested defense and indemnity, appellee filed a declaratory judgment action. The parties ultimately filed cross-motions for summary judgment. The trial court granted appellee's motion, denied appellant's, and appellant appealed. Finding no error, we affirm.

### Factual and Procedural Background

In December 2001, appellee transmitted a proposed subcontract to Allstates for repair work to be performed on a cellular telephone tower in Forrest City, Arkansas. On December 27, 2001, Allstates signed the subcontract and returned it to appellee. Allstates' employees commenced work on the tower project prior to Christmas Day, 2001. After the Christmas vacation, the Allstates workers returned to the project on January 2, 2002. As part of the repair project, the Allstates workers installed a pulley and rope system on the tower. One end of the pulley system was attached to a headache ball, which consists of a heavy weight. The other end was attached to a pick-up truck, which would provide the power to raise and lower the headache ball. An equipment building on the tower site was between the headache ball end of the pulley system and the pick-up truck.

During the afternoon of January 2, the job site foreman, Forester Barnes, instructed three workers, John Seabolt, Jamie Anders, and Brian Barnes, to climb to the 280 foot level of the tower to take measurements. Approximately ten minutes later, Barnes heard the signal to raise the headache ball. Barnes then went to the pick-up truck, started it, and started slowly backing the truck up to raise the headache ball. Barnes did not know where the three workers were or that they had attached themselves to the headache ball. When the headache ball had been raised fifteen to twenty feet, the headache ball moved above the equipment building and Barnes was able to see the three men attached to the headache ball. When they came into view, Barnes exchanged hand signals with the workers asking what was going on? The men signaled for Barnes to continue raising them to the top of the tower. Barnes then continued slowly backing the truck up until the men had reached about the eighty foot elevation level. At that point, the rope broke and the men fell to their deaths.

Allstates performed no further work under the subcontract after January 2, 2002. On January 3, 2002, appellee signed the subcontract.

On August 12, 2002, Anders' and Seabolts' heirs filed suit against appellee in federal district court in Mississippi. Appellee sought defense and indemnification from appellant, Allstates' insurer, pursuant to an indemnity clause found in the subcontract. Appellant had insured Allstates with both a commercial general liability policy ("CGL policy") and a commercial automobile policy ("auto policy"). Appellant denied coverage. Appellee then filed a declaratory judgment action in Texas

state court. Appellant counterclaimed for declaratory judgment as well. While the declaratory judgment action was pending, appellee settled the Mississippi lawsuit.

Eventually, the two sides narrowed the issues in the declaratory judgment action down to whether two exclusions of coverage applied. Both exclusions are found in section I, part 2 of the CGL policy:

Exclusion b:

This insurance does not apply to:

b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

\* \* \*

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

Exclusion g:

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

The same contractual liability exclusion is also found in the auto policy. Both sides filed competing traditional motions for summary judgment on the applicability of the exclusions. The trial court ultimately granted appellee's and denied appellant's motion. This appeal followed.

### DISCUSSION

Appellant raises two issues on appeal. First, appellant contends Exclusion g in the CGL policy, the auto exclusion, applies to the Arkansas accident because a pick-up truck was used to power the pulley system. Next, appellant asserts the contractual liability exclusion precludes coverage under both the CGL and auto policies because appellee did not sign the subcontract until the day after the Arkansas accident.

### A. Insurance Contract Construction and the Standard of Review

■■■ Insurance policies are construed according to the ordinary rules of contract construction. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003). In determining the scope of coverage, a court examines the policy as a whole to ascertain the true intent of the parties. *Utica Nat'l Ins. Co. of Texas v. Am. Indem. Co.*, 141 S.W.3d 198, 202 (Tex.2004) citing *Mid–Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 158 (Tex.1999). To determine this intent, we generally limit our inquiry to the "four corners" of the policy. *See Esquivel v. Murray Guard Inc.*, 992 S.W.2d 536, 544 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). When dealing with an exclusionary clause, a court must adopt the construction urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent. *Utica Nat'l Ins.*, 141 S.W.3d at 202 citing *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex.1991). Because this case deals with exclusions, the appellant insurance company bears the burden of proof to establish that the exclusions apply in this case. *Id.* at 204.

■■■ Declaratory judgments decided by summary judgment are reviewed under the same standards of review that govern summary judgments generally. Tex. Civ. Prac. & Rem.Code Ann. § 37.010 (Vernon

2006); *Lidawi v. Progressive County Mut. Ins. Co.*, 112 S.W.3d 725, 730 (Tex.App.-Houston [14th Dist.] 2003, no pet.). Under the traditional summary judgment standard of review, a movant has the burden to show at the trial level that there are no genuine issues of material fact, and it is entitled to judgment as a matter of law. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). In determining whether there is a genuine fact issue precluding summary judgment, evidence favorable to the non-movant is taken as true and we make all reasonable inferences in his favor. *Id.* We review the trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). A movant is entitled to summary judgment only if it conclusively proves all essential elements of its claim. *Johnston v. Crook*, 93 S.W.3d 263, 273 (Tex.App.-Houston [14th Dist.] 2002, pet. denied).

When both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex.2000). When the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both parties and determine all questions presented. *Id.* The reviewing court should render the judgment that the trial court should have rendered or reverse and remand if neither party has met its summary judgment burden. *Id.*

## B. Exclusion "g," the Auto Exclusion

The trial court, by granting appellee's motion for summary judgment, decided Exclusion g did not apply. The parties agree the resolution of this issue is guided by the test found in the *Lindsey* case cited above. There, the Supreme Court held:

> For an injury to fall within the "use" coverage of an automobile policy,
> (1) the accident must have arisen out of the inherent nature of the automobile, as such,
> (2) the accident must have arisen within the natural territorial limits of an automobile, and the actual use must not have terminated,
> (3) the automobile must not merely contribute to cause the condition which produces the injury, but must itself produce the injury.

*Lindsey*, 997 S.W.2d at 157.

In *Lindsey*, a young boy climbed through the back window of a pick-up, which dislodged a gun from a gun rack, which in turn discharged, hitting another boy sitting in a car parked next to the pick-up. The injured boy's family settled with the pick-up owner for the limits of that insurance policy. The settlement fell far short of the amount needed to pay the injured boy's medical expenses so the family sought coverage under their own Uninsured/Underinsured Motorist Policy. The insurance company denied coverage because the injury did not involve the "use" of an automobile. The Supreme Court disagreed, holding the incident met all three elements. In the process, the Supreme Court distinguished an entire line of cases addressing drive-by shootings, which consistently held they did not involve the "use" of an automobile, by stating:

> [a] drive-by shooting involves a vehicle only incidentally. The shooter could be standing still and accomplish the same result. In such a situation, even if the first two factors of the Appleman/Couch[1] test were satisfied, the

1. *See* JOHN A. APPLEMAN, INSURANCE LAW AND PRACTICE (Buckley ed.) § 4317,

third could not be because the vehicle's role in the occurrence is minimal as compared with the shooter's.

*Lindsey,* 997 S.W.2d at 158.[2]

The result in *Lindsey* does not determine the result here. In *Brown v. H.I.S.D.,* this court affirmed the trial court's determination that the school district was immune from liability in a suit filed by a victim of a sexual assault perpetrated by a school district police officer who used his district patrol car to pull the victim over. *Brown v. H.I.S.D.,* 123 S.W.3d 618, 622–23 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). The victim argued the Texas Tort Claims Act ("TTCA") applied because the incident involved the use of a motor vehicle. *Id.* at 619. This court held the TTCA did not apply because, while the incident did involve a motor vehicle, the motor vehicle did not actually cause the victim's injuries. *Id.* at 622. In the process, we distinguished the result in *Lindsey* because the Supreme Court "relied on a line of insurance coverage cases in which a gun was discharged in or from vehicles." *Id.* at 621. Finally, we limited *Lindsey* to its facts by holding "we believe [*Lindsey*] may be of limited use outside the context in which it occurred. The accidental discharge of firearms has produced a whole body of case law in which insurance coverage was the issue. This body of law ultimately controlled—or at least directed—the outcome in [*Lindsey*]." *Id.* The court then applied the three element *Lindsey* test and determined (1) the incident did

not occur within the territorial limits of the patrol car (the assault actually occurred in the victim's vehicle), and (2) the patrol car did not itself produce the injury, but only assisted the officer in accomplishing his unlawful purpose. *Id.* at 622–623.

■ The result in this case is determined by *Brown,* the line of drive-by shooting cases distinguished by the Supreme Court in *Lindsey,* and a second, earlier Supreme Court case, *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs. Fast Motor Lines, Inc.,* 939 S.W.2d 139 (Tex.1997). In *Merchants,* a truck driver negligently fired a gun while driving his truck, which struck and killed a person riding in a vehicle traveling next to the truck. *Merchs.,* 939 S.W.2d at 141. The Supreme Court held there was no duty to defend because the petition did not allege facts showing the injury was the result of the use of a vehicle. *Id.* at 142. Here, the pick-up truck did not cause the deaths of the three workers, the defective rope did. Instead, the pick-up truck simply provided the power for the pulley system, which is not enough to constitute "use" under the CGL policy. *See Collier v. Employers Nat'l Ins. Co.,* 861 S.W.2d 286, 289 (Tex. App.-Houston [14th Dist.] 1993, writ denied). Therefore, even assuming the facts of this case meet the first two *Lindsey* requirements, we hold they do not meet the third requirement, that the vehicle actually produce the injury rather than merely contribute to it. Because the workers' deaths did not arise out of the use of a motor vehicle, we overrule appellant's first issue.

at 367–69 (1979); 8 COUCH ON INSURANCE 3D § 119.37, at 119–56 (1997).

2. *See Le v. Farmers Tex. County Mut. Ins. Co.,* 936 S.W.2d 317, 321 (Tex.App.-Houston [1st Dist.] 1996, writ denied) (holding that the "use" requirement of uninsured motorist coverage is not satisfied by a drive-by shooting because the gun was the instrumentality that

caused the injuries, not the car); *see also Collier v. Employers Nat'l Ins. Co.,* 861 S.W.2d 286, 289 (Tex.App.-Houston [14th Dist.] 1993, writ denied) (holding that a drive-by shooting does not involve the use of a motor vehicle simply because an automobile provided the site for a criminal assault or provided transportation to the location of a criminal act).

## C. The Contract Exclusion

In its second issue, appellant contends the contract exclusion precludes coverage because only one party, Allstates, had actually signed the subcontract prior to the underlying incident. According to appellant, to meet the execution requirement found in the insurance policies, both appellee and Allstates had to physically sign the subcontract prior to the incident. We disagree.

Initially, appellee forwarded the subcontract to Allstates and Allstates signed the subcontract on December 27, 2001 and returned it to appellee. The term "execution" is not defined in the subcontract or in the insurance policies. It is undisputed both parties were performing under the subcontract when the underlying incident occurred on January 2, 2002. Finally, it is undisputed appellee signed the contract on January 3, 2002.

This issue is resolved by two similar cases: *Travelers Ins. Co. v. Chi. Bridge & Iron Co.*, 442 S.W.2d 888 (Tex.Civ.App.-Houston [1st Dist.] 1969, writ ref'd n.r.e.) and *ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane, Inc.*, 115 S.W.3d 287 (Tex.App.-Corpus Christi 2003, pet. denied).

In *Travelers*, Chicago Bridge and J.T. Thorpe Co. agreed Thorpe could use certain equipment owned by Chicago Bridge provided Thorpe executed a printed rental agreement. *Travelers*, 442 S.W.2d at 890–91. Prior to the accident at issue in that case, Chicago Bridge's representative signed the agreement, while Thorpe's representative only signed after the accident. *Id.* at 891. Following the incident, Thorpe's insurance company denied coverage, arguing the insurance policy required both parties to sign a written agreement prior to the incident. *Id.* The court of appeals disagreed stating that the parties were performing under the contract prior to the incident and there was a written agreement. The court continued that there was evidence from which an inference could be drawn that the parties intended the contract to be in writing and to be effective from the time the equipment was first used by Thorpe. *Id.* at 897.

In *Brownsville Barge*, the contract was prepared by Brownsville Barge and sent to ABB, which signed the contract and returned it to Brownsville Barge. *Brownsville Barge*, 115 S.W.3d at 292. The court concluded ABB accepted the contract even though Brownsville Barge never signed it. *Id.* The court held that as long as both parties gave their consent to the terms and there is no evidence of an intent to require both signatures as a condition precedent, signatures are not required in the making of a valid contract. *Id.*

Because (1) the term "execution" is not defined in either the CGL policy or the auto policy, (2) there is no language in the policies requiring both parties to sign the contract, (3) Texas law does not require the parties to a contract to actually sign for a contract to be valid and enforceable, and (4) there was no summary judgment evidence raising a fact issue of the parties' intent to require both signatures as a condition precedent, in fact the evidence established the exact opposite, we conclude appellant's construction of the insurance policies is incorrect. *See Travelers*, 442 S.W.2d at 890–91. Accordingly, we hold that, under Texas law, the subcontract was executed prior to the January 2, 2002 incident and we overrule appellant's second issue.

### CONCLUSION

Having overruled both of appellant's issues on appeal, we affirm the trial court's final judgment.

SEYMORE J., Dissenting, in part and Concurring, in part.

CHARLES W. SEYMORE, Justice, concurring and dissenting.

Allstates Construction Company ("All-states") was the named insured on a Comprehensive General Liability policy ("CGL") and a Commercial Auto Policy ("CAP") issued by Mid–Continent Casualty Company. Allstates entered into a contract with Global Enercom Management, Inc. ("GEM") to replace guy wires on a cellular phone tower. Allstates employees rigged a pulley and rope system in preparation to ascend a tower, knowing that the source of power would be a pick-up truck operated by another employee. Another Allstates employee attached the rope to eye-hooks on the truck's front bumper, and after receiving hand signals from fellow employees, knowingly and intentionally used the truck to lift the three Allstates employees high inside the tower. The following designed and engineered features of the truck were employed to lift Allstates employees high inside the tower: (1) bumper or frame with eye-hooks (2) steering wheel (3) engine (4) gears (5) wheels (6) brakes. The tension in the rope created by power from the truck engine, the weight of three employees, and other factors, caused the rope to break.

The majority opines that Exclusion g does not preclude coverage because "the workers' deaths did not arise out of the use of a motor vehicle." Referring to the causation requirement of the arise-out-of-use test outlined in *Mid–Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 157 (Tex.1999), the majority concludes that "the pick-up truck simply provided the power for the pulley system" and that it was "the defective rope" that caused the workers' deaths. I respectfully dissent because I disagree with the majority's causation analysis and disposition of Mid–Continent's first issue.

This court's determination of whether liability coverage is excluded under the CGL turns our interpretation of all the language in Exclusion g, found in Section I, Part 2 of the policy.

This insurance does not apply to:

Exclusion g:

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

First, the majority fails to incorporate all of the Exclusion g in its interpretation of the policy. To "arise out of" simply means that a causal connection or relation exists between the accident or injury and the use of the motor vehicle. *Mid–Century Ins. Co.*, 997 S.W.2d at 156 (Tex.1999). In other words, whether an injury arises out of the use of a motor vehicle is determined by a "but for" test, not direct or proximate cause. *Utica Nat. Ins. Co. v. American Indemnity Co.*, 141 S.W.3d 198, 202 (Tex.2004); *McCarthy Bros. Co. v. Cont'l Lloyds Ins. Co.*, 7 S.W.3d 725, 730 (Tex.App.-Austin 1999, no pet.); *see also Admiral Ins. Co. v. Trident NGL, Inc.*, 988 S.W.2d 451, 454 (Tex.App.-Houston [1st Dist.] 1999, pet denied). By stating that "the pick-up truck simply provided the power for the pulley system" and that it was the "defective rope" that caused the injury, the majority ignores the above authority and disposes of this insurance coverage issue with a bare conclusion that the broken rope implicitly eliminates operation or use of the pick-up truck as a producing cause of the occurrence.

In interpreting the insurance policy, relative to the third requirement in *Lindsey*, I would employ traditional tort law doctrines that pertain to causation. Proximate cause means that cause which, in a natural and continuous sequence, produces an event, and without which cause such

event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. **There may be more than one proximate cause of an event.** *See* Texas Pattern Jury Charge; General Negligence PJC 2.4 (2003) (emphasis added). Producing cause in the context of compensation for employee injuries means: "that cause which, in a natural and continuous sequence, produces the death, and without which death would not have occurred." *Jones v. Traders & General Ins. Co.*, 140 Tex. 599, 169 S.W.2d 160, 162 (1943). Producing cause in the context of products liability means "an efficient, exciting, or contributing cause, which in a natural sequence, produced injuries or damages complained of, if any. There can be one or more than one producing cause." *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975). *See also* Texas Pattern Jury Charge; DTPA/Insurance Code PJC 102.1, 102.7, 102.8 (2003). Considering this traditional definition of "producing cause" which denotes or implicates multiple causes, the phrase "must itself produce the injury" is difficult to interpret and apply. However, as explained below, the majority's implicit conclusion that the pick-up did not **"itself produce"** the injuries and deaths is not supported by the supreme court's analysis and disposition of the coverage issue in *Lindsey*.

The majority fails to explain the difference between "contributing to the condition which causes the injury," as compared to "must itself produce the injury." Here, the underlying summary judgment evidence militates the following conclusion:

but for negligent operation or use of the truck, negligence of the deceased employees, and defects in the rope, if any, the accident would not have occurred. Accordingly, I would hold that the injuries and deaths arose-out-of "use" of the pick-up truck.[1]

Second, I disagree with the majority's application of case precedent. The majority suggests the result in this case is controlled by *Brown v. H.I.S.D.*, 123 S.W.3d 618 (Tex.App.-Houston [14th Dist.] 2003, pet. denied), the line of drive-by shooting cases distinguished by the Supreme Court in *Lindsey*, and *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139 (Tex. 1997). In *Brown*, the victim was raped inside her own vehicle, not the offending officer's patrol car. Officer Nicholas used his patrol car to stop the victim, then instructed her to drive onto the parking lot where he committed the assault. From these facts, the court concluded that the "patrol car was not being 'used' when Nicholas assaulted appellant." *Brown*, 123 S.W.3d at 622. The court further concluded that the "patrol car did not itself produce the injury, but only assisted the officer in accomplishing his unlawful purpose." *Id.* at 622–623. The vehicle was involved in the assault, but its use did not cause the injury. *See id.* Here, unlike the patrol car in *Brown*, it is judicially admitted that the pick-up truck was in "use" when the accident occurred. Additionally, use of the pick-up truck was beyond "mere involvement." The operator or driver of the pick-up truck played a direct role in the chain of events that led to the workers' deaths. Thus, *Brown* does not determine the result in this case.

---

1. Any fact issue relative to use or operation of the pick-up truck was eliminated by GEM's replies to Mid–Continent's requests for admissions numbered 12 and 13. GEM judicially admitted that a motor vehicle was "being used" or "in operation" at the time of the accident. *See* Tex R. Civ. Pro 198.

In *Lindsey*, the court distinguished the intentional tort drive-by shooting cases from other cases in which there is a nexus between the injury and the use or operation of an automobile, concluding that such shootings do not arise out of the use of the vehicle. *Lindsey*, 997 S.W.2d at 157–164. As the majority notes, a vehicle's use during a drive-by shooting is only incidental to the cause of the injury because "the shooter could be standing still and accomplish the same result." *Id.* at 158. The third requirement of the arising-out-of-use test could not be satisfied because the "vehicle is the mere situs" of a shooting that "has nothing to do with the use of the vehicle." *Id.* Here, the majority fails to acknowledge that the pick-up truck was operated in such a manner as to create the chain of causation. Without the pick-up truck, the workers would not have been pulled high into the tower, and there would not have been tension on the rope. The pick-up truck could not have been "standing still and accomplished the same result." *Id.* Consequently, I disagree with the majority's assertion that the supreme court's reasoning relative to the drive-by shooting cases determines the result in this case.

In *Merchants*, the driver of a truck negligently fired a gun while driving, killing the passenger of a car traveling next to him. The court held that "a causal relationship between the injury and the use of the auto is essential to recovery." *Merchants*, 939 S.W.2d at 142. The truck in *Merchants* was "the mere situs" of an accident which did not result from the use of the truck. *Id.* The majority attempts to conform the facts of this case to the facts of *Merchants* by stating that the accident was the result of the rope breaking and not the use of the truck. However, nothing in *Merchants* showed that the use of the truck had anything to do with the driver's negligent firing of the gun. In this case, it is clear that the truck was operated or used in a manner calculated to cause tension in the rope. There is an obvious "nexus between the use and the accident to warrant the conclusion that the accident resulted from such use." *See id.*

I respectfully submit that this court should not reject the supreme court's analysis and application of law to fact in *Lindsey*. Metzger, a young lad, attempted to enter a locked truck by climbing through the back window. While crawling into the truck, he dislodged a gun from a rack and caused it to discharge. Applying the third Lindsey factor, the court concluded: " ' "we think on balance the Metzer truck 'produced'—to use the factor's word-the injury." ' " The court then stated very clearly, "[s]urely if the movement of the truck had caused the shotgun to discharge, there would be little question that the vehicle produced the injury." *Lindsey*, 997 S.W.2d at 158. Similarly, in this case, it was movement or operation of the truck that created tension on the rope, resulting in the accident. The rope that tragically broke was directly connected to and affected by movement of the pick-up truck Here, the chain of causation that flows directly from "use" of the Allstates pick-up far surpasses Metzger's attenuated "use." The Metzger boy was simply attempting to enter a locked truck. The supreme court concluded that he was using the truck, as contemplated by the same language in Exclusion g. A fortiori, the causal relationship between operation of the Allstates truck and the deaths, satisfies the "use" requirement of Exclusion g.

Third, the majority concludes that the CGL policy provides coverage for the incident if operation of the pick-up merely "contributed to" rather that "itself produce" the injuries and deaths. Under the majority's holdings, there is coverage under the CGL and the CAP for same occurrence. This result is inconsistent with

other authority involving concurrent causation. In cases involving concurrent causation, the excluded and covered events combine to cause the plaintiff's injuries. If the two causes cannot be separated, the exclusion is triggered. *Utica*, 141 S.W.3d at 204. Considering the undisputed summary judgment evidence and GEM's judicial admissions, an inseparable chain of causation which included operation or use of the Allstates pick-up truck combined to cause the injuries and deaths. Accordingly, applying the plain language in Exclusion g, and the supreme court's analysis in *Lindsey*, there is no coverage under the CGL for the occurrence in question.

In conclusion, I would reverse the trial court's summary judgment that Mid–Continent's CGL policy provides liability coverage for the underlying claims, and hold that coverage is precluded under the plain language in Exclusion g. Accordingly, I respectfully dissent to that portion of the majority opinion dealing with Mid–Continent's first issue. I concur in the result only with respect to the majority's disposition of Mid–Continent's second issue pertaining to the execution requirement for "insured contracts" in both policies.